[redacted]

No. 07-186C
(Judge Sweeney)

Agreed-Upon Redacted Copy

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

WESTECH INTERNATIONAL, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

DEFENDANT'S BRIEF

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

WILLIAM P. RAYEL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tel. (202) 616-0302
Fax. (202) 307-0972

Attorneys for Defendant

OF COUNSEL:

Don W. Crockett
Office of General Counsel
U.S. Department Of Energy
1000 Independence Ave., SW
Washington, D.C. 20585

June 4, 2007

## TABLE OF CONTENTS


STATEMENT OF THE ISSUES ..... 1

STATEMENT OF FACTS AND COUNTER-STATEMENT OF FACTS ..... 2

SUMMARY OF THE ARGUMENT ..... 6

ARGUMENT ..... 7

I. The Standard of Review ..... 7

A. Standard For Procurement Challenges ..... 7

B. Standard For Judgment Upon The Administrative Record ..... 9

II. NNSA's Cost Realism Determination For Westech Was Rational ..... 11

A. NNSA's Addition Of 0.8 FTEs To Westech's Probable Cost For A Subject Matter Expert Consultant For Security Classification Administrative Support Was Rational ..... 12

B. NNSA's Conversion Of An Administrative Position To A Subject Matter Expert In The VA Area Was Rational ..... 15

C. NNSA's Addition Of An Additional 1.7 FTEs To Westech's Probable Cost Was Rational ..... 18

D. NNSA Was Rational In Increasing Westech's Probable Cost By Applying A Three Percent Escalation Rate To Westech's SCA Positions ..... 21

E. NNSA Was Rational In Increasing Westech's Probable Cost By Applying A Three Percent Escalation Rate To CAS's SCA Positions ... 23

II. NNSA Was Rational In Downgrading Westech's Technical Rating And Increasing Its Probable Cost Because Westech Proposed Inadequate Staffing .. 24

III. Because Westech Finished Far Behind Three Offerors In Its Technical Evaluation, Any Errors In The *Cost Realism Analysis* Would Be Irrelevant And Westech Must Prove *Significant* Errors In Its *Technical Evaluation* In Order To Prove That It Was Prejudiced ..... 27

V. Even If Westech Can Prove That NNSA Committed Prejudicial Errors, This Court Should Not Permanently Enjoin PAI's Performance Of The Contract Or Direct NNSA To Reevaluate The Contract .................................. 29

A. The Harm To The Government From Granting Westech's Requests For Injunctive Relief Would Be Significantly Greater Than Any Harm To Westech If The Court Denied Westech's Requests For Injunctive Relief .......................................................................... 30

B. It Is Not In The Public Interest To Grant Westech's Request For Injunctive Relief .......................................................................... 34

CONCLUSION .................................................................................................................. 34

## TABLE OF AUTHORITIES

### CASES

Bannum, Inc. v. United States,
404 F.3d 1346 (Fed. Cir. 2005) .................... passim

Beta Analytics Int'l, Inc. v. United States,
67 Fed. Cl. 384 (2005) .................... 8, 9, 11

Blue & Gold Fleet, LP v. United States,
70 Fed. Cl. 487 (2006) .................... 25

Bromley Contracting Co. v. United States,
15 Cl. Ct. 100 (1988) .................... 8

Califano v. Sanders,
430 U.S. 99 (1977) .................... 7

Camp v. Pitts,
411 U.S. 138 (1973) .................... 10

Campbell v. United States,
2 Cl. Ct. 247 (1983) .................... 8

CCL Serv. Corp. v. United States,
48 Fed. Cl. 113 (2000) .................... 10

Cincom Systems, Inc. v. United States,
37 Fed. Cl. 663 (1997) .................... 8

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971) .................... 7, 8

Esch v. Yeutter,
876 F.2d 976 (D.C. Cir. 1989) .................... 30, 31

E.W. Bliss Co. v. United States,
77 F.3d 445 (Fed. Cir. 1996) .................... 8

Florida Power & Light v. Lorion,
470 U.S. 729 (1985) .................... 10

Halter Marine, Inc. v. United States,
56 Fed. Cl. 144 (2003) ........................................ passim

Impressa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) ........................................ 7, 8, 11

Lions Raisins, Inc. v. United States,
51 Fed. Cl. 238 (2001) ........................................ 9

Magellan Corp. v. United States,
27 Fed. Cl. 446 (1993) ........................................ 34

M.W. Kellogg Co. v. United States,
10 Cl. Ct. 17 (1986) ........................................ 8

Novell, Inc. v. United States,
46 Fed. Cl. 601 (2000) ........................................ 25

OMV Med., Inc. v. United States,
219 F.3d 1337 (Fed. Cir. 2000) ........................................ 9

PGBA, LLC v. United States,
389 F.3d 1219 (Fed. Cir. 2004) ........................................ 29, 30

PGBA, LLC v. United States,
60 Fed. Cl. 196 (2004), aff'd,
389 F.3d 1219 ........................................ 30

Park Tower Mgmt., Ltd. v. United States,
67 Fed. Cl. 548 (2005) ........................................ 26

Ramcor Servs. Group, Inc. v. United States,
185 F.3d 1286 (Fed. Cir. 1999) ........................................ 7

Redland Genstar, Inc. v. United States,
39 Fed. Cl. 220 (1997) ........................................ 8

Serco, Inc., B- 298266,
2006 WL 2482978 (Comp. Gen. Aug. 9, 2006) ........................................ 25, 26

Synetics, Inc. v. United States,
45 Fed. Cl. 1 (1999) ........................................ 7, 8

Tech Systems, Inc. v. United States,
50 Fed. Cl. 216 (2001) ........................................ 9, 10

The Cube Corp. v. United States,
46 Fed. Cl. 368 (2000) .................... 7

Thompson v. Cherokee Nation of Oklahoma,
334 F.3d 1075 (Fed. Cir. 2003) .................... 26

## STATUTES

5 U.S.C. § 702, 706(2) .................... 7

28 U.S.C. § 1491(a)(3) .................... 34

28 U.S.C. § 1491(b)(1), (4) .................... 7

41 U.S.C. § 351, et. seq .................... 5

42 U.S.C. §§ 2014(aa), 2701 .................... 32

## REGULATIONS

10 C.F.R. § 70.4 .................... 32

Agreed-Upon Redacted Copy

[redacted]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| WESTECH INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07-186C |
| v. | ) | (Judge Sweeney) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant respectfully requests the Court to grant the United States judgment upon the administrative record and deny plaintiff's motion for judgment on the administrative record. The administrative record demonstrates that the Government's evaluation of plaintiff, Westech International, Inc. ("Westech"), was rational.

DEFENDANT'S BRIEF

STATEMENT OF THE ISSUES

1. Whether Westech has demonstrated that the cost realism determination for Westech's proposal was irrational.

2. Whether Westech has demonstrated that increasing Westech's probable cost and downgrading Westech's technical score for failing to propose an adequate number of employees to perform the solicitation requirements was irrational.

3. Whether Westech has demonstrated any prejudicial errors in the procurement process.

4. Whether Westech has demonstrated an entitlement to injunctive relief.

STATEMENT OF FACTS AND COUNTER-STATEMENT OF FACTS

On April 18, 2005, the United States Department of Energy ("DOE"), National Nuclear Security Administration ("NNSA"), issued a small business set-aside competitive solicitation, No. DE-RP52-05NA99344, to provide Security System Services for the NNSA Nevada Site Office ("NSO") and Nevada Test Site ("NTS"). AR 1903. The NTS is a 1,375 square-mile Federal reservation located approximately 65 miles northwest of Las Vegas, Nevada. Id. The NTS provides the supporting infrastructure, air space, and utilities to serve the United States in developing innovative solutions to complex problems involving special nuclear material; hazardous materials; and multi-agency, integrated operations. Id.

The NTS represents the United States' single, unique capability to support nuclear testing and major experiments that involve special nuclear material or hazardous materials. Id. Strong competencies in critical technical fields reside in the skilled employees of the NSO partnerships, such as nuclear safety and nuclear explosives safety and operations; remote field experiments and operations; first responder training; physical and environmental science; nuclear waste management systems and technology; design and fabrication of electronic, mechanical, and structural systems; remote and robotic sensing; management of a broad range of infrastructure, mining, engineering, and construction; and chemical, explosives, and hazardous materials systems and technology. Id. As such, the NTS requires a system that enables the protection and security of the entire reservation. Id. In support of the NTS, the areas of work for the Security System Services contract are: (1) Vulnerability Assessments ("VA"), to be performed by "Q-cleared, Subject Matter Experts"; (2) Operational Security Support ("OPSEC"); (3) Site

Safeguards and Security Plans ("SSSP"); (4) Security Classification Administrative Support; (5) Physical Fitness Training; (6) Classified Matter Staffing and Administrative Support; (7) Pass and Badging; and (8) Other Security Support. Id. at 67-70.

The solicitation required the offerors to submit a three-volume proposal consisting of: (1) the offer and other documents; (2) a technical proposal consisting of four Key Personnel (Program Manager, OPSEC Manager, SSSP manager and VA Manager), Technical Capability and Past Performance; and (3) a cost proposal. Id. at 54-60. The contract was to be awarded based on the following criteria, in descending order of importance: (1) Key Personnel; (2) Technical Capability; (3) Past Performance; and (4) cost. Id. at 64-65. The first three factors were significantly more important than cost. Id. at 65. In evaluating the proposals, Key Personnel was assigned 45 points, Technical Capability was assigned 40 points and Past Performance was assigned 15 points, for a total technical score of 100 points. Id. at 1910.

The solicitation stated that, in evaluating an offeror's Technical Capability, NNSA will consider the "Offeror's technical approach to successfully accomplish the SOW including whether the Offeror's technical approach demonstrates a thorough understanding of any technical risks and their impact associated with performance of the contract, as well as the Offeror's approach to minimizing those risks." Id. at 65. The solicitation also stated that each offeror's cost proposal would be analyzed for reasonableness, realism and completeness, with adjustments to probable cost made for unrealistic proposals. Id. at 66. With regard to cost realism, the solicitation stated that "[i]nconsistencies between the Cost Proposal and other portions of the proposal could raise concerns regarding the Offeror's understanding of the requirements and ability to perform the work for the proposed cost." Id. Furthermore, an

"unrealistic, unreasonable, or incomplete cost proposal may be evidence of the offeror's lack of or poor understanding of the requirements of the solicitation, and thus may adversely affect the offeror's rating on the Technical Proposal criteria." Id. (emphasis added).

By July 7, 2005, 14 offerors submitted initial proposals. Id. at 1906-07. On September 22, 2006, a competitive range was established consisting of five offerors: Santa Fe Protective Services ("Santa Fe"); Gregg Protection Services ("GPS"); Protection Strategies Incorporated ("PSI"); Westech; and PAI Corporation ("PAI"). Id. at 1907. Discussions were held with each of the five offerors, and they submitted revised proposals on October 6, 2006. Id. After the revised proposals were submitted, another round of discussions was held with four of the five offerors,[1] and the offerors submitted final revised proposals on November 9, 2006. Id. The final round of discussions disclosed the Government's staffing estimate and asked the offerors to substantiate any deviations from the Government estimate in accordance with the offeror's technical approach. Id. at 1601-02.

On December 4, 2006, NNSA issued its Final Evaluation Report assigning technical scores to the four remaining offerors. Id. at 1898-1982. The Final Evaluation Report also explained NNSA's probable cost determinations. Id. PAI was given an overall technical score of 90.2, while Westech was given an overall technical score of [redacted]. Id. at 1910. Although Westech had the highest score for Past Performance, its Key Personnel and Technical Capability scores were significantly lower than the other three remaining offerors. Id. The Key Personnel score, which is not at issue in this case, was lower than the other three offerors because

[1] GPS was eliminated from the competition due to a conflict of interest involving its proposed Program Manager. Id. at 1907.

Westech's Program Manager lacked technical experience in some of the Statement of Work areas. Id. at 1937. Westech's Technical Capability score was lower than the other three offerors because: (1) Westech failed to propose adequate staffing in accordance with its technical approach, id. at 1947, which is the only issue in this case regarding Westech's technical ratings; (2) Westech failed to explain how its approach to conducting VAs would not compromise the role of Federal personnel in providing independent oversight, id. at 1944; and (3) Westech failed to clearly describe the Federal role in accomplishing OPSEC. Id. at 1945.

The Final Evaluation Report also detailed reasons why Westech's probable cost was increased by $2,843,725. Most of this increase was due to Westech's inadequate staffing in the areas of VA, Security Classification Administrative Support, Classified Matter Staffing and Other Security Support. Id. at 1958-59. A small adjustment was also made to Westech's probable cost because Westech failed to include a labor escalation rate for it and its subcontractor's employees that were covered by the Service Contract Act, 41 U.S.C. § 351, et. seq. ("SCA"). Id. at 1869.

The Source Selection Authority ("SSA") reviewed the Final Evaluation Report and determined that PAI represented the best value to the Government. AR 1983-90. The SSA also found that, based upon Westech's inferior Program Manager and staffing shortfall, PAI, PSI and Santa Fe all presented a better value to the Government than Westech, even though Westech's probable cost was $[redacted] lower than PAI, [redacted] than PSI and [redacted] than Santa Fe. Id. at 1989. In so finding, the SSA noted:

> I am mindful of the needs of the NSO particularly with regard to providing the type of security services necessary at the NTS. NSO cannot risk a contractor undertaking responsibilities at the NTS without adequate staffing. This shortcoming in Westech's

> technical proposal does not merit award at a lower probable cost relative to the other three Offeror's cost proposals.

Id. The SSA also noted that she was "concerned that Westech's shortfall in its proposed staffing, without adequate explanation, could adversely affect successful performance of these SOW elements." Id. at 1987.

On December 6, 2006, PAI and Westech were notified that PAI had been awarded the contract. Id. at 1991-2040. On March 20, 2006, Westech filed the instant bid protest in this Court.

## SUMMARY OF THE ARGUMENT

The administrative record demonstrates that NNSA did not commit any errors in evaluating Westech's proposal. Rather, NNSA rationally determined that Westech had not proposed adequate staffing in the areas of VA, Security Classification Administrative Support, Classified Matter Staffing and Administrative Support and Other Security Support because Westech had not adequately substantiated its deviation from the Government estimate that had been released to the four remaining offerors in November 2006. NNSA also rationally determined that a 3 percent labor rate escalation for Westech and its subcontractor's SCA-covered employees was necessary to establish a realistic cost for Westech.

Additionally, in accordance with the solicitation and precedent, NNSA rationally downgraded Westech's technical rating, as well as increasing Westech's probable cost, based upon Westech's under-staffing. Had NNSA failed to do so, it may have exposed itself to a protest by PAI, if Westech had won the award.

Moreover, even if Westech could prove that NNSA committed some errors in the procurement process, it could only demonstrate prejudice if it proved that it would have had a

substantial chance of being awarded the contract, absent such errors. The SSA's analysis shows that cost was not a significant factor in her decision. Therefore, Westech needed to prove that NNSA made technical significant errors in order to prove prejudice, i.e., that Westech had no staffing shortfall.

Finally, even if Westech can prove prejudicial errors, it has not proven that it is entitled to injunctive relief. Rather, the harm to the NTS, NSO and national security would greatly outweigh any harm to Westech and granting Westech's requests for injunctive relief would not be in the public interest.

## ARGUMENT

### I. The Standard of Review

#### A. Standard For Procurement Challenges

Judicial review of the agency's actions in bid protest cases is not a de novo proceeding; rather, the scope of the review is limited to the administrative record. The proper standard of review is whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law based solely upon the administrative record. 28 U.S.C. § 1491(b)(1), (4); 5 U.S.C. § 702, 706(2)(A); Impressa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001); see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), overruled on other grounds by, Califano v. Sanders, 430 U.S. 99 (1977); Ramcor Servs. Group, Inc. v. United States, 185 F.3d 1286, 1290 (Fed. Cir. 1999); The Cube Corp. v. United States, 46 Fed. Cl. 368, 374 (2000); Synetics, Inc. v. United States, 45 Fed. Cl. 1, 5 (1999). The Court must consider whether the decision was based upon

consideration of the relevant factors and whether there has been a clear error in judgment. Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 394 (2005).

In determining whether the agency's action was arbitrary or capricious, the scope of the Court's review is very limited. Cincom Systems, Inc. v. United States, 37 Fed. Cl. 663, 671 (1997). In reviewing the agency's procurement decisions, the Court should recognize that the decision is entitled to a "presumption of regularity," Citizens to Preserve Overton Park, 401 U.S. at 415 (citations omitted), and that the Court should not substitute its judgment for that of the agency. Redland Genstar, Inc. v. United States, 39 Fed. Cl. 220 (1997); Cincom, 37 Fed. Cl. at 672; See also M.W. Kellogg Co. v. United States, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations"). Thus, the disappointed bidder "bears a heavy burden" and the procurement officer is "entitled to exercise discretion upon a broad range of issues confronting [her]." Impressa, 238 F.3d at 1332 (citations omitted). This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." Bromley Contracting Co. v. United States, 15 Cl. Ct. 100, 105 (1988); see also Campbell v. United States, 2 Cl. Ct. 247, 249 (1983).

Challenges regarding "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." Beta Analytics, 67 Fed. Cl. at 395 (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996)). "The evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of the procurement

officials, and thus reviewing courts give greatest the deference possible to these determinations." Id. (citations omitted).

"Decisions on cost realism are within the agency's sound discretion and expertise, and the judgment will not be overturned absent any rational basis." Halter Marine, Inc. v. United States, 56 Fed. Cl. 144, 172 (2003) (citation omitted). In order to be rational, the agency need not demonstrate that the cost realism analysis was performed with "impeccable rigor." Id. (quoting OMV Med., Inc. v. United States, 219 F.3d 1337, 1344 (Fed. Cir. 2000)). Instead, "the analysis must reflect that the agency took into account the information available and did not make irrational assumptions or critical miscalculations." Id. (citation omitted).

Additionally, if the protestor can show any errors in the procurement process, the protestor must then show that it was "significantly prejudiced" by those errors. Bannum, Inc. v. United States, 404 F.3d 1346, 1354 (Fed. Cir. 2005) (citations omitted). To establish significant prejudice, the protestor must show that "there was a 'substantial chance' it would have received the contract award but for the errors . . ." Id. (citations omitted).

B. Standard For Judgment Upon The Administrative Record

Pursuant to RCFC 52.1, this Court reviews the agency's procurement decisions to determine whether they are supported by the already-existing administrative record. The standards applicable to a motion for judgment upon the administrative record differ from those applied in the context of a Rule 56 motion for summary judgment. Bannum, 404 F.3d at 1355-56; Lions Raisins, Inc. v. United States, 51 Fed. Cl. 238, 246-47 (2001); Tech Systems, Inc. v. United States, 50 Fed. Cl. 216, 222 (2001) (explaining basis for summary judgment on the administrative record). Unlike a Rule 56 motion, "proceeding under RCFC [52.1] merely

restricts the evidence to the agency record . . . ." Bannum, 404 F.3d at 1356. "Thus, the central inquiry on a motion for summary judgment -- whether the movant has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes summary judgment -- has no bearing on a review of the administrative record . . . ." Tech Systems, 50 Fed. Cl. at 222; accord Bannum, 404 F.3d at 1356 (holding that RCFC [52.1] requires a different standard of review without the burden-shifting and presumptions required pursuant to RCFC 56).

Unlike a motion for summary judgment, the question of whether an issue of material fact is disputed has no bearing upon a review of the administrative record in a record review case, such as a bid protest. The inquiry, instead, is whether, given all the disputed and undisputed facts, the plaintiff has met its burden of proof that the contracting officer's decision was arbitrary, capricious, or contrary to law. Id. (citing CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 119 (2000)). In reviewing the agency's action under this narrow, deferential standard, "the focal point for judicial review should be the administrative record already in existence, not some record made initially by the reviewing court." Florida Power & Light v. Lorion, 470 U.S. 729, 743-44 (1985) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)); see also Bannum, 404 F. 3d at 1356 (holding that RCFC [52.1] is designed to provide for expedited trial upon a paper record and that the trial court is required to make factual findings based upon the record evidence).

II. NNSA's Cost Realism Determination For Westech Was Rational

Westech challenges NNSA's decision to add $2,843,725 to Westech's final proposed cost as an estimate of its probable cost. Pl. Br. 17-27.[2] Westech has broken down its challenge into five specific additions to its probable cost: (1) the addition of 0.8 FTEs for Security Classification Administrative Support ($[redacted]); (2) the substitution of a VA subject matter expert for an administrative person ($[redacted]); (3) the addition of a total of 1.7 additional FTEs in several other statement of work areas ($[redacted]); (4) the three percent escalation in wages for Westech employees covered by the SCA ($[redacted]); and (5) the three percent escalation in wages to SCA positions in Westech's subcontract with Corporate Allocation Services, Inc. ("CAS") ($[redacted]).[3] Id. at 18.

As noted above, cost realism determinations and technical judgments are within the sound discretion of procurement officials and Westech bears a heavy burden in attempting to demonstrate that NNSA's determinations lacked a rational basis. Impressa, 238 F.3d at 1332; Beta Analytics, 67 Fed. Cl. at 395; Halter Marine, 56 Fed. Cl. at 172. Westech has not met this

---

[2] "Pl. Br. __" refers to a page in the brief in support of Westech's motion for judgment on the administrative record filed with this Court on May 14, 2007.

[3] Westech's recitation of the probable cost increase in its brief is essentially correct. However, Westech appears to have added the three percent escalation in wages to the VA subject matter expert and 1.7 additional FTEs in the other areas. Because Westech has specifically challenged the three percent escalation, it makes more sense to analyze the three percent escalation separate from the VA subject matter expert and additional FTEs. As such, the new breakdown would be: [redacted]. In any event, as we demonstrate in Section IV below, this change would be immaterial as a change of less than $86,000 to Westech's probable cost either way should not affect this Court's determination of whether Westech has established prejudice.

burden. Rather, the administrative record demonstrates that NNSA's cost realism determinations were rational.

A. NNSA's Addition Of 0.8 FTEs To Westech's Probable Cost For A Subject Matter Expert Consultant For Security Classification Administrative Support Was Rational

Westech argues that the addition of 0.8 FTE for a subject matter expert consultant to the Security Classification Administrative Support area of work was irrational because the additional 0.8 FTEs were added to assist in a task that was not explicitly mentioned in the Statement of Work. Id. at 19-21. Westech's argument apparently misapprehends the evaluation criteria as set forth in the solicitation.

For the Security Classification Administrative Support task, Westech proposed a Classification Support person (1.0 FTE) and a part-time subject matter expert consultant (0.2 FTEs), [redacted], to "review, maintain, and ensure accuracy of local classification guides" and "assist in and respond to findings associated with program self-assessments and Security Surveys conducted by NSO or NNSA HQ to assure compliance with DOE O471.2A and DOE M471.2-1b." AR 1623. NNSA determined that:

> While 0.2 FTE (approximately 372 DPLHs/year) may be appropriate for routine classification guide updates, this amount of coverage will not be sufficient to resolve findings that result from the self-assessments or surveys. Any findings require an involved response to resolve the findings. The SME would be required to assist in this response.

Id. at 1871. As such, NNSA added 0.8 FTEs to the Security Classification Administrative Support task at [redacted] labor rate.

Westech argues that self-assessments and surveys were not specifically listed as a requirement under the Security Classification Administrative Support task in the Statement of

Work, AR 68, and thus, it was irrational to add the additional 0.8 FTEs. Pl. Br. 20. However, Westech's argument ignores: (1) the solicitation's cost realism evaluation criteria, AR 66; (2) the contracting officer's November 2, 2006 discussion letter to Westech stating that deviations from the Government's estimate must be substantiated in accordance with Westech's technical approach, id. at 1601; and (3) the solicitation's requirement that offerors' technical approaches understand and minimize technical risks. Id. at 55, 65.

In describing the cost realism evaluation, the solicitation states that the "Cost Proposal will be evaluated to determine if the proposed costs are realistic for the work to be performed, reflect a clear understanding of the SOW requirements, and are consistent with the various elements of the offeror's Technical Proposal." Id. at 66 (emphasis added). The November 2, 2006 discussion letter requests that Westech substantiate any deviations from the Government's estimate of required FTEs "in accordance with [its] technical approach . . ." Id. at 1601. The solicitation and discussion letter make clear that the realism of Westech's proposed cost will be evaluated based upon Westech's technical approach to the Statement of Work areas, not solely based upon the explicit requirements of the Statement of Work.

Furthermore, the solicitation states that, in evaluating an offeror's technical approach, NNSA will consider the "Offeror's technical approach to successfully accomplish the SOW including whether the Offeror's technical approach demonstrates a thorough understanding of any technical risks and their impact associated with performance of the contract, as well as the Offeror's approach for minimizing those risks." Id. at 65 (emphasis added). In the portion of its proposal detailing its technical approach to Security Classification Administrative Support, Westech identified the following technical risk: "If staff and guidelines do not conform to DOE

orders[,] the risks include not meeting support schedules[] and incomplete or inaccurate local guidance[.] This could result in the compromise of classified information with subsequent damage to national security." Id. at 1634. As part of its plan to minimize this risk, Westech proposed to have its subject matter expert consultant, [redacted], assist in and respond to findings associated with program self-assessments and reviews of other classification program activities. Id. at 1623, 1635.

In its evaluation, NNSA noted that Westech identified the risk that guides and reports would not meet requirements, and that Westech's plan of using experienced personnel and conducting self-assessments should minimize that risk. Id. at 1945-46. Therefore, Westech's argument that self-assessments and surveys were not technically listed in the Security Classification Administrative Support task in the Statement of Work is without merit because, as part of its own technical approach, Westech itself deemed them necessary to minimize risks associated with that area of work. As such, in accordance with the cost realism evaluation criteria in the solicitation, NNSA was entitled to increase Westech's probable cost by 0.8 FTEs to ensure that it had a realistic probable cost estimate for Westech's technical approach to Security Classification Administrative Support.

Westech also argues that, if it was appropriate for NNSA to increase Westech's probable cost by 0.8 FTEs for Security Classification Administrative Support, it was not rational for NNSA to use Westech's labor rate for [redacted]. Pl. Br. 21. Rather, Westech argues that it would have been more appropriate for NNSA to use the average hourly rate for PAI's more highly paid FTE in the Security Classification Administrative Support area of work, which

would have resulted in a probable cost increase of over $[redacted] less than what NNSA added. Id. This argument is also without merit.

As noted above, Westech's technical approach to minimizing risks included the use of experienced personnel to conduct self-assessments. AR 1635. In fact, in its "Proof of Performance" part of the Security Classification Administrative Support section of its proposal, Westech wrote, "Proof resides in our SME contributor, [redacted]" and then described [redacted] qualifications. Id. Therefore, Westech's technical approach included the use of [redacted] to conduct and respond to the findings of the self-assessments and surveys Westech proposed. Accordingly, consistent with Westech's technical approach, it was rational to add the additional 0.8 FTEs at [redacted] consultant rate. Because PAI did not propose a subject matter expert to perform any self-assessments or surveys, id. at 165-67, 594-95, as Westech did, PAI's labor rate was irrelevant and NNSA's addition of 0.8 FTEs for a subject matter expert consultant for Security Classification Administrative Support was rational.[4]

### B. NNSA's Conversion Of An Administrative Position To A Subject Matter Expert In The VA Area Was Rational

In its final proposal, Westech proposed two FTEs who were subject matter experts and one full-time administrative person to perform the VA function. Id. at 1621, 1642. The

---

[4] Westech's claim that it was treated differently than PAI because PAI was given credit for making additional VA personnel available, again, shows Westech's lack of understanding of the risk minimization aspect of the proposals. Pl. Br. 20. PAI noted that a risk to performing the VA element of the Statement of Work was that [redacted]. AR 389, 1923. In order to minimize this risk, [redacted]. Id. However, PAI still proposed [redacted], to perform the work required by the Statement of Work for the VA area. Id. at 562, 654, 741. Therefore, no probable cost adjustment was required for PAI in the VA area. Id. at 741.

Statement of Work specifies that "VAs shall be performed by the Contractor's Q-cleared, Subject Matter Experts . . ." Id. at 67. On November 2, 2006, the contracting officer sent Westech the Government's estimate for the number of FTEs necessary to perform the elements of the Statement of Work and asked Westech to substantiate any deviations from the Government estimate in accordance with its technical approach. Id. at 1601. The Government estimated that three FTEs were needed in the VA area. Id. Westech appears to have understood the three FTEs in the Government estimate as including administrative staff and, therefore, did not attempt to substantiate its deviation from the three FTEs in the Government estimate. Id. at 1620, 1642. However, the Statement of Work is clear that only subject matter experts can perform VAs. Id. at 67. Therefore, Westech failed to adequately substantiate its deviation from the Government estimate.[5] In its final proposal, Westech did state that it would draw upon subject matter experts from the "Federal workforce or other contractors working at the site," id. at 1621, 1643, however, Westech did not explain how its "proposed approach would not compromise the role of Federal personnel in providing independent oversight of the contractor." Id. at 1944. Therefore, it was rational for NNSA to increase Westech's probable cost by converting Westech's third FTE in the VA area from an administrative person to a subject matter expert.

---

[5] Westech's argument that "NNSA erred in not advising Westech that only subject matter experts would be acceptable in its November 2, 2006 letter" is without merit. Pl. Br. 23. The Statement of Work was clear that only subject matter experts can perform VAs. AR 67. To explicitly state, in its final discussion letter, that the three FTEs in the Government estimate were expected to be subject matter experts would have been superfluous. Furthermore, PAI did not misunderstand the requirement that subject matter experts must perform VAs, id. at 741, nor does it appear that PSI or Santa Fe misunderstood the requirement due to the fact that their probable costs were not increased. Id. at 1910.

In its brief, Westech attempts to direct the Court away from the plain language of the Statement of Work and the November 2, 2006 discussion questions, by citing an August 2006 Quantitative Evaluation prepared for the Competitive Range Report, which stated that Westech's proposed VA staffing of two FTEs, who are subject matter experts, and 0.5 FTEs for an administrative person was adequate for performing the VA function. Pl. Br. 22-23. However, the Competitive Range Report and any evaluations made to arrive at the competitive range determination are irrelevant to these proceedings. The purpose of the Competitive Range Report was to establish a competitive range of the most highly rated offerors in order to conduct discussions with those offerors. See AR 2515. Westech was included in the competitive range and considered for the award of the contract. Id. Westech is challenging the fact that it was not awarded the contract, not any exclusion from the competitive range. As such, the Competitive Range Report is irrelevant to these proceedings.

In any event, NNSA had a rational basis for the differences between the Quantitative Evaluation in August 2006 and the Quantitative Evaluation in December 2006. In making the competitive range determination, NNSA was mindful of the fact that it would be conducting discussions with the offerors. Id. Although Westech's approach in its initial proposal explained its understanding of the VA process, "Westech's approach did not clearly elaborate as to how they would accomplish this SOW element." Id. at 1267, 2527. However, since Westech's proposed VA Manager "has extensive management experience and broad VA technical knowledge," NNSA gave Westech the benefit of the doubt that it would be able to adequately explain, through discussions, how it would efficiently perform the VA function with only two FTEs that are subject matter experts. Id. at 2498. In discussions, NNSA asked Westech to

elaborate on how it would accomplish the VA element. Id. at 1267. In the judgment of the technical experts at NNSA, when Westech elaborated on its technical approach to VAs, it was unable to substantiate how its technical approach would create efficiencies necessary to allow it to perform the VA function with only two subject matter experts. Id. at 1944. Therefore, it was rational for NNSA to increase Westech's probable cost by converting Westech's administrative support person in the VA function to a subject matter expert.

C. NNSA's Addition Of An Additional 1.7 FTEs To Westech's Probable Cost Was Rational

Westech argues that NNSA erred by adding approximately 1.7 FTEs to its probable cost estimate in the areas of Classified Matter and Administrative Support (0.5 FTEs), Security Awareness/S&S Performance Training Program Coordinator (1.0 FTE) and IT/Website support (0.16 FTEs).[6] Pl. Br. 24-25. However, the addition of these FTEs was rational because Westech failed to substantiate its deviation from the Government estimate, as required by the November 2, 2006 discussion letter, and NNSA found that, based upon Westech's technical approach, these additional FTEs would be necessary to fulfill the Statement of Work requirements. AR 1601, 1957, 1959.

As noted above, on November 2, 2006, NNSA released its revised Government estimate and requested that each offeror substantiate any deviations from the estimate. Id. at 1601. In response to this letter, Westech added additional FTEs in some areas, but still proposed only approximately 6.2 FTEs for the areas of OPSEC, Security Classification Administrative Support, Classified Matter Staffing and Administrative Support and Other Security Support, id. at 1621,

[6] For the IT/Website support category, NNSA actually added 0.2 FTEs per year for four of the five contract years, averaging approximately 0.16 FTEs per year. AR 1957.

1623-24, while the Government estimated that it would require 9 FTEs to perform these elements. Id. at 1601. In its brief, Westech claims, without elaboration, that it "explained in its final proposal that it had reviewed the requirements and believed the proposed staffing was adequate because of its practice in cross-training its employees to cover multiple tasks based on successful contracts using these techniques." Pl. Br. 25 (citing AR 1620-24). However, Westech failed to adequately explain exactly how its successful use of cross-training on past contracts would translate to 2.8 less FTEs than the Government estimate for this contract. AR 1620-24.

Based on Westech's attempt to substantiate its deviations from the Government estimate, as well as Westech's overall proposal, NNSA evaluated whether Westech's proposed staffing was adequate. Id. at 1956-59. Finding Westech's proposal to be inadequate, NNSA rationally increased Westech's probable cost by 1.0 FTE in the "Other Security Support" area for Security Education/S&S Professional Training Coordinator ("Coordinator"). Westech proposed 0.1 FTEs for this position. Id. at 1624. The Security Education/S&S Professional Training Coordinator is the only position besides the Web Designer that Westech proposed for the "Other Security Support" element of the Statement of Work. Id. Therefore, this person would presumably be responsible for security briefings, updating security education and training records and performing the Safeguards Security Professional Training Program for NSO and its contractors (except for Protective Force personnel), all of which are required by the Statement of Work. Id. at 70. However, Westech only proposed 0.1 FTEs to perform all of this work, i.e., the Coordinator would spend only one-tenth of his time performing this function, while spending the other nine-tenths on another function (OPSEC). Id. at 1624. Westech made no attempt to

explain how, through cross-training or any other method, 0.1 FTEs could perform security briefings, update security and training records and perform the Safeguards Security Professional Training Program for NSO and its contractors. Id. at 1624; see also 1375-78. Therefore, NNSA reasonably added 1.0 FTE to Westech's probable cost "for adequate coverage of security briefings, security education and training records and Safeguards Security Professional Training." Id. at 1959.

NNSA also rationally increased Westech's probable cost by 0.5 FTEs in Classified Matter Staffing. Westech proposed to have one of its OPSEC Security Specialists act as a back up to the custodian of its Classified Matter Control Center and provide classified matter protection and control training. Id. at 1623, 1636. However, NNSA rationally determined that an additional 0.5 FTEs for administrative support should be added because the OPSEC Security Specialist would have numerous OPSEC responsibilities that could adversely affect his performance in the Classified Matter Staffing area. Id. at 1959. While Westech referenced its experience at NNSA's Pantex Site Office in Amarillo, TX as a basis that it could perform the Classified Matter Staffing work with 1.0 FTE, id. at 1623, the Pantex contract did not involve any OPSEC responsibilities, but rather, was a much smaller contract (five years, [redacted]) that dealt with "training development, personnel security support, and Classified Matter Protection and Control." Id. at 1400. As such, NNSA rationally determined that the Pantex office contract did not provide sufficient support for Westech's assertion that it could perform the Classified Matter Staffing element with only 1.0 FTE, where the Pantex contract did not involve an OPSEC Security Specialist performing Classified Matter Staffing duties in addition to his numerous OPSEC responsibilities.

Additionally, NNSA rationally increased Westech's probable cost by 0.2 FTEs for four of the five years of the contract for IT/Web Site support, within the Other Security Support area of work. Westech proposed 0.2 FTEs in the first year of the contract and no FTEs in the other four years of the contract. Id. at 1624. Westech also proposed utilizing outside resources to maintain the web-based publication in the last four years, such as a M&O contractor. Id. NNSA rationally identified the risk that the outside resources "may not be qualified in security policies or procedures" or even available. Id. at 1959. Although Westech claimed that it had successfully employed its strategy on other contracts, it failed to identify those contracts or how the strategy had been implemented. Id. at 1624. Therefore, NNSA was reasonable in adding an additional 0.2 FTEs to Westech's probable cost for four of the five contract years.

Finally, Westech's argument that "NNSA mechanically substituted its own Government Estimate figures" is unfounded. Pl. Br. 25. Besides documenting and supporting each of its additions to Westech's probable cost, as described above, NNSA only added approximately 2.5 FTEs to Westech's probable cost for the areas of OPSEC, Security Classification Administrative Support, Classified Matter Staffing and Administrative Support and Other Security Support, when NNSA would have needed to add 2.8 FTEs in order to reach the Government estimate. AR 1601. Westech was given an opportunity to substantiate its deviation from the Government estimate, but failed to adequately do so. Id. at 1601, 1620-24. As such, the increase to Westech's probable cost was rational.

D. NNSA Was Rational In Increasing Westech's Probable Cost By Applying A Three Percent Escalation Rate To Westech's SCA Positions

Westech argues that NNSA erred in increasing Westech's probable cost by applying a three percent escalation rate to positions covered by the SCA. Pl. Br. 26-27. Westech's

argument is without merit. In its final proposal, Westech escalated the wages of its non-SCA employees by three percent to account for increases pursuant to Westech's standard compensation policies. AR 1666-67. Westech did not escalate the wages of it employees covered by the SCA because "they are anticipated to change by contract modification in the event of an updated wage determination being incorporated to the contract." Id. at 1667. In determining a probable cost, it is inherently rational for NNSA to take into consideration the fact that there would likely be increases in wage determinations. Even Westech impliedly concedes this. Pl. Br. 26 ("Because the proposal was for a cost type contract, it would probably have been prudent to include some reasonable escalation to reflect anticipated increases in the Wage Determination.").

Rather than challenging the fact of the escalation, Westech instead argues that three percent was irrational. Id. at 26-27. However, the three percent escalation is rational based upon Westech's own proposal and compensation policy. Despite failing to escalate its SCA positions, Westech wrote in its proposal, "The proposed escalation rate of 3.0% is therefore judged reasonable by management for WESTECH company-wide and is not anticipated to vary for the geographical area. WESTECH anticipates that this escalation will be vital in order to recruit and retain qualified personnel." AR 1667 (emphasis added). If Westech judged the three percent escalation to be reasonable company-wide and vital to recruit and retain qualified personnel, it cannot reasonably be argued that a three percent escalation would not be vital to recruiting and retaining employees covered by the SCA.[7]

[7] Although some of the SCA positions are more administrative in nature, Westech still emphasized the experience of some of its SCA personnel in its proposal. See, e.g., id. at 1370-71.

Furthermore, Westech's argument that NNSA should not have applied a three percent escalation because the three percent escalation for the rest of the employees includes merit increases, Pl. Br. 26 (citing AR 1666), is contradicted by Westech's own compensation policy. While Westech's proposal was clear that the three percent escalation factor included merit increases, Westech's compensation policy was also clear that "[m]erit reviews are performed on an annual basis for all employees." AR 1696 (emphasis added). There is no exemption for SCA employees in Westech's compensation policy.[8] Id.

Therefore, NNSA was reasonable in increasing Westech's probable cost by applying a three percent escalation rate to Westech's SCA covered positions.

E. NNSA Was Rational In Increasing Westech's Probable Cost By Applying A Three Percent Escalation Rate To CAS's SCA Positions

Westech argues, without citation to the record, that NNSA erred in applying a three percent escalation rate to CAS's SCA positions because CAS was committed to supporting the contract at the proposed fixes hourly rates. Pl. Br. 27. This argument is factually incorrect. In its proposal, CAS states, "The rates proposed in accordance with the Service Contract Wage Determination No. 2005-2332, Rev. 1 are not escalated as they are anticipated to change by contract modification in the event of an updated wage determination being incorporated to the contract." AR 1731 (emphasis added). Also, similar to Westech's compensation policy, CAS's

[8] Westech's argument that NNSA should have sought a cost impact of the non-escalation of wages from the Defense Contract Audit Agency ("DCAA") is without merit. As demonstrated above, the record evidence shows that the three percent escalation rate was rational. Also, DCAA did not take exception to the three percent escalation for Westech's other employees. Id. at 1609. Therefore, it is likely that all DCAA would have done for a cost impact is calculate the impact of escalating the wages of the SCA-covered positions by three percent each year. NNSA staff was perfectly capable of doing this themselves and Westech has not taken issue with the actual calculation.

compensation policy states, "Merit reviews are performed for all employees on an annual merit cycle where employees receive an increase in pay based on: 1) a performance rating and 2) position within the salary ranges. Additional compensation can be realized through performance incentives." Id. at 1736 (emphasis added). Again, there is no exemption for SCA employees in CAS's compensation policy. Id.

Westech's argument that the three percent escalation has no rational basis is equally without merit. In its initial proposal, CAS included a three percent labor rate escalation for its employees. Id. at 1183. Although CAS's initial proposal was not based upon SCA labor rates, id. at 1182, it is rational to assume that the three percent escalation was based upon CAS's compensation policies. Therefore, three percent was the most rational escalation rate for CAS's SCA employees. As such, NNSA was rational in applying a three percent escalation rate to CAS's SCA positions.

II. NNSA Was Rational In Downgrading Westech's Technical Rating And Increasing Its Probable Cost Because Westech Proposed Inadequate Staffing

Westech argues that even if NNSA was correct in increasing Westech's probable cost because of its staffing shortfall, NNSA erred in also downgrading Westech's technical score. Pl. Br. 28-31. Westech cites no precedent for what it characterizes as its "double penalty" argument. Id. Rather, Westech's argument is contradicted by both the terms of the solicitation and precedent.

The section of the solicitation regarding "cost evaluation criteria" states that an "unrealistic, unreasonable, or incomplete cost proposal may be evidence of the offeror's lack of or poor understanding of the requirements of the solicitation, and thus may adversely affect the offeror's rating on the Technical Proposal criteria." AR 66 (emphasis added). NNSA found that

"Westech did not provide a clear explanation with regard to its proposed deviation and how the work could be successfully accomplished. Moreover, this shortfall in FTEs could result in assignments to individuals that have significant responsibilities and could adversely affect performance of these SOW elements." Id. at 1947. Therefore, in downgrading Westech's technical score for its proposed under-staffing, NNSA evaluated Westech's proposal in accordance with the terms of the solicitation.[9] If Westech is challenging the terms of the solicitation, its argument is time barred. Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487, 513 (2006) (holding that protest of terms of the solicitation was untimely when filed after another offeror's proposal was selected); Novell, Inc. v. United States, 46 Fed. Cl. 601, 615 (2000) ("Offerors may challenge the terms of the solicitation, but only prior to submission of final proposals.") (citations omitted).

Also, the recommendation of the Government Accountability Office ("GAO") in Serco, Inc., B- 298266, 2006 WL 2482978 (Comp. Gen. Aug. 9, 2006) is instructive in this case. In Serco, a disappointed bidder, Serco, Inc. ("Serco") challenged the award of a Naval contract to AMSEC LLC ("AMSEC"). After AMSEC and Serco submitted their initial proposals, the Navy determined that none of the offerors appeared to have proposed enough hours to perform tasks

---

[9] Westech claims that "NNSA did not assert that Westech's offering 2.5 fewer FTEs than the Government Estimate showed a lack of understanding of the technical requirements of the Statement of Work." Pl. Br. at 28. However, by stating that the "shortfall in FTEs could result in assignments to individuals that have significant responsibilities and could adversely affect performance of these SOW elements," AR 1987, NNSA was, in effect, stating that Westech had failed to understand the requirements of the Statement of Work. Westech cannot reasonably argue that a failure to propose adequate staffing has no effect upon an offeror's understanding of the technical requirements of the solicitation. Also, although we see no effective difference, the solicitation stated that an unrealistic proposed cost may show a "lack of or poor understanding of the requirements of the solicitation," not "technical requirements." Id. at 66 (emphasis added).

required and decided to disclose the Government estimate and allow revised proposals. Id. at *1. Regarding the sample tasking in the proposals, the solicitation stated "[t]his information shall demonstrate that the offerors fully understand the specific and unique requirements of the efforts . . ." Id. at *2. The solicitation also stated that proposals that are "unrealistically high or low in terms of cost, may be deemed reflective of an inherent lack of technical competence, or indicative of a failure to comprehend the complexity of risks of the proposed work and may be grounds for rejection of the proposal." Id. at *3.

After the revised proposals, the Navy performed a cost realism analysis and determined that AMSEC had "underestimated the level of effort to perform the sample task requirements by more than 50 percent" and adjusted the AMSEC's probable cost accordingly. Id. at 5-6. However, the Navy still gave AMSEC a "pass" rating for the understanding of work factor and did not reevaluate AMSEC's proposal in light of the cost realism adjustment. Id. at 4-5. The GAO found that failing to reevaluate AMSEC's technical score in light of the cost realism adjustments was an error and recommended that the Navy reevaluate AMSEC's technical score. Id. at 6.

Based upon Serco, had NNSA merely increased Westech's probable cost without downgrading its technical score due to Westech's lack of understanding of the work requirements, NNSA would have exposed itself to a potential protest from PAI before the GAO or this Court,[10] if Westech had been awarded the contract. Therefore, it was rational to evaluate

[10] Although decisions of the GAO are not binding on this Court, the Court has stated that such decisions can be of great value when considering issues of Federal procurement law. See Park Tower Mgmt., Ltd. v. United States, 67 Fed. Cl. 548, 563 n.29 (2005) (citing Thompson v. Cherokee Nation of Oklahoma, 334 F.3d 1075, 1084 (Fed. Cir. 2003)).

Westech's proposal in accordance with the terms of the solicitation and applicable GAO precedent.

III. Because Westech Finished Far Behind Three Offerors In Its Technical Evaluation, Any Errors In The *Cost Realism Analysis* Would Be Irrelevant And Westech Must Prove *Significant* Errors In Its *Technical Evaluation* In Order To Prove That It Was Prejudiced

Westech argues that if any one of the five areas it challenges "is found to be without a rational basis, then the calculus of the required trade-off will change." Pl. Br. 32. However, as noted above, the standard for prejudice enunciated by the Federal Circuit is not whether the "calculus of the required trade-off will change," but rather, whether there is a "substantial chance" that the protestor "would have received the contract award but for the errors." Bannum, 404 F.3d at 1353 (citations omitted).

Also, the solicitation states that the cost evaluation criteria is significantly less important than the other three evaluation criteria (Key Personnel, Technical Capability and Past Performance). AR 65. This is evidenced by the decision of the SSA. The SSA considered that Westech provided the lowest probable cost, but determined that, because Westech proposed inadequate staffing and had the least qualified Program Manager, the SSA could not justify awarding the contract to Westech over PAI, PSI or Santa Fe. Id. at 1989. Although Westech's probable cost was only [redacted] less than PAI, Westech probable cost was [redacted] than PSI and [redacted] than Santa Fe. Id. The SSA found PAI, PSI and Santa Fe's technical proposals to be "essentially equivalent." Id. at 1988. NNSA only increased Westech's probable cost by $2.84 million. Id. at 1985. Therefore, even if Westech could prove that the probable cost increase was an error, Westech's probable cost would still only be [redacted] below PAI. Id. at 1985. If a [redacted] between Westech and Santa Fe was

not enough to boost Westech above Santa Fe, then a [redacted] dollar difference between Westech and PAI would not be enough to boost Westech over PAI since Santa Fe and PAI's technical proposals were "essentially equivalent." Id. at 1988.

While we recognize that some of Westech's challenges are to both the cost realism analysis and technical capability ratings, some are not. NNSA did not downgrade Westech's technical ratings because of Westech's failure to include an escalation factor for Westech or CAS's SCA-covered employees. Id. at 1944-47. Similarly, even if Westech is successful in arguing that NNSA erred in adding 0.8 FTEs to the Security Classification Administrative Support area at Westech's consultant's rate, rather than some lower rate, it would have no effect on Westech's technical rating. The downgrade in technical rating was due to the staffing shortfall, and had nothing to do with the rate at which the additional 0.8 FTEs would be paid under the cost realism analysis. See id. at 1947. Therefore, even if Westech could prove that NNSA erred in all of these areas, it still could not prove prejudice.

Finally, even if Westech can prove that NNSA erred in downgrading its technical capability rating because NNSA did not have a rational basis for adding some of the additional FTEs to its probable cost, Westech cannot prove that it had a "substantial chance" of receiving the award. As noted above, in finding that an award to Westech could not be justified, even at a lower price, the SSA focused on two areas: (1) Westech's inferior Program Manager; and (2) Westech's shortfall in staffing. Id. at 1989. On the issue of staffing, the SSA wrote:

> I am mindful of the needs of the NSO particularly with regard to providing the type of security services necessary at the NTS. NSO cannot risk a contractor undertaking responsibilities at the NTS without adequate staffing. This shortcoming in Westech's technical proposal does not merit award at a lower probable cost relative to the other three Offeror's cost proposals.

Id. The SSA also wrote that she was "concerned that Westech's shortfall in its proposed staffing,

without adequate explanation, could adversely affect successful performance of these SOW elements." Id. at 1987. At no point in her Source Selection Statement, did the SSA make reference to the number of FTEs that Westech was short or the inadequate staffing mix in the VA area. Id. at 1983-90. Rather, the SSA merely stated that her decision was based upon Westech's inadequate staffing. This demonstrates that Westech's elimination from contention was not based on any particular lack of staffing, but rather, the very fact that it had proposed inadequate staffing. As such, given the minor role cost played in the SSA's decision, Westech cannot demonstrate that it had a substantial chance of receiving the contract award unless it can demonstrate that NNSA erred in all of its determinations that Westech had proposed inadequate staffing, especially considering that Westech had the least qualified Program Manager.[11]

V. Even If Westech Can Prove That NNSA Committed Prejudicial Errors, This Court Should Not Permanently Enjoin PAI's Performance Of The Contract Or Direct NNSA To Reevaluate The Contract

Even if Westech were to succeed in establishing that NNSA committed prejudicial errors in awarding the contract to PAI, the Court must also consider three additional criteria before ordering a permanent injunction: (1) "whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief"; (2) "whether the balance of hardships to the respective parties favors the grant of injunctive relief"; and (3) "whether it is in the public interest to grant injunctive relief." PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (2004) (citations

[11] Key Personnel was the most important criteria of the solicitation and the Program Manager position was "significantly more important" than the other three Key Persons.

omitted). Here, Westech has not asserted any irreparable harm,[12] the harm to the Government from granting Westech's requests would outweigh any harm to Westech from not granting the injunctive relief and it would not be in the public interest to grant Westech's requests for injunctive relief.

A. The Harm To The Government From Granting Westech's Requests For Injunctive Relief Would Be Significantly Greater Than Any Harm To Westech If The Court Denied Westech's Requests For Injunctive Relief

Westech has not proven that it would suffer any harm should the Court deny its requests for injunctive relief. However, if the Court were to grant Westech's request for injunctive relief, order PAI to stop work on the contract and order NNSA to reevaluate the proposals, the harm to the Government would be severe.

Many of the security functions currently being performed by PAI are essential to the daily operation of NSO and NTS and cannot be stopped without bringing the entire operation to a standstill. Bodin Decl. ¶ 5.[13] For example, PAI runs the badging operations at both the NTS

---

[12] Westech appears to have assumed without argument that it is entitled to injunctive relief if it proves prejudicial errors. Pl. Br. 33. Therefore, Westech has not asserted that it would suffer any irreparable harm if the Court denied its requests for injunctive relief and its requests for injunctive relief should be denied. Because Westech has failed to enunciate any harm, our arguments in this brief must necessarily focus on the significant harm to the NTS, NSO and national security interests that would follow from granting Westech's requests for injunctive relief. We note that plaintiff would have faced difficulty in asserting irreparable harm given the fact that it waited until over three months after contract performance to institute its suit (nearly two months after its debriefing) and did not seek preliminary injunctive relief. See PGBA, LLC v. United States, 60 Fed. Cl. 196, 221 (2004), aff'd, 389 F.3d 1219.

[13] Defendant respectfully moves to supplement the administrative record with a declaration from Patricia M. Bodin, attached to this brief as Attachment 1. Ms. Bodin's declaration is attached to inform the Court of the consequences to the NTS, NSO and national security of granting Westech's requests for injunctive relief. Supplementation is appropriate in limited circumstances, such as this, where specific relief is at issue. E.g., Esch v. Yeutter, 876

and NSO. Id. Each day, several hundred visitors come and go from these sites, each of whom require special badging. Id. This includes visitors from DOE's laboratories all over the country and vendors such as the United States Postal Service and Federal Express. Id. If the badging operation were shut down, a substantial number of activities at the NTS would come to a standstill because the NTS cannot operate without proper security access control. Id. The NTS conducts high-hazard operations in support of national security missions. Id. A shutdown in operations would affect time-sensitive national security operations for DOE, NNSA, Department of Homeland Security, Department of Defense and other government agencies who rely upon the ability of the NTS to conduct their field work. Id.

PAI also provides the current classification guidance necessary for the review of documents to determine whether they are classified or sensitive. Id. at ¶ 6. Without this guidance and review, much of the paperwork at the NSO would come to a standstill. Id. A substantial amount of documentation that NSO prepares is for NNSA or DOE program offices in Washington, DC. Id. Without the classification guidance support, NSO would not be able to send critical program information to Washington. Id.

Additionally, OPSEC is an awareness program that continually informs employees of their security responsibilities, performs assessments to see where employees are not following security requirements, and identifies areas where NSO is most vulnerable. Id. at ¶ 7. Ceasing this program puts the NTS and NSO at risk for security breaches and the potential for irreparable harm to the security of the United States. Id.

---

F.2d 976, 991 (D.C. Cir. 1989) (citation omitted).

Finally, the NTS possesses, accepts, transfers and uses special nuclear material in its high-hazard operations. Id. at ¶ 8. Special nuclear material is essentially plutonium and certain forms of uranium that can be used to create nuclear weapons. See 42 U.S.C. §§ 2014(aa), 2701. The PAI contract provides for eight functions that enable the NTS to carry out these high hazard operations. Bodin Decl. ¶ 8. New operations with special nuclear material cannot begin until appropriate VAs are conducted. Id. There are currently nine VAs on the NTS priority list and risk assessments have been conducted and completed on five NTS high hazard operations. Id. Not conducting these VAs would prevent the conduct of planned operations with special nuclear material. Id.

Because of the recently announced NNSA 2030 Complex Initiatives, NTS and NSO must be ready to accept several new security missions within the next year. Id. These missions include the storage of nuclear devices and the disposition of excess Category I special nuclear materials.[14] Bodin Decl. ¶ 8. Integral to acceptance of these new security missions are the completion of several VAs by PAI. Id. The outcome of those VAs will determine the protection strategy necessary for those missions and their accompanying requirements. Id. Once these VAs are completed, PAI will then have to modify the Site Safeguards and Security Plan. Id. Modification to the Site Safeguards and Security Plan will then necessitate changes in access authorization for some areas of the NTS and identification of changes to the classification of information associated with those areas and operations. Id. Virtually all the functions that PAI performs for NSO now weave together to form a seamless security organization. Id.

---

[14] Category I special nuclear material is "strategic special nuclear material in any combination in a quantity of 5000 grams or more" as computed by a specific regulatory formula. 10 C.F.R. § 70.4.

No entity, including NNSA itself, is currently in a position to step in and assume all of PAI's responsibilities if PAI were enjoined from continuing its performance of the site security contract. Id. at ¶ 9. Accordingly, an injunction precluding the continued performance of PAI's contract would cause irreparable harm to the NTS, NSO and the security of the United States. Id.

Even if NNSA were to award another contractor PAI's contract after a re-evaluation, the operation of the NTS and NSO, and the security of the United States, would still be harmed. If another contractor were awarded PAI's contract, a long transition similar to the one PAI just completed would have to be accomplished, which, in and of itself, would be very detrimental to the NTS and NSO. Id. at ¶ 10. PAI has completed its transition, fully staffed all functions, completed the required worker safety health plan, finalized operating permits and security plans, completed necessary site-specific training requirements and certifications, received more than 6,000 classified documents and is operating at a fully satisfactory level. Id. It took approximately five months for PAI to accomplish all of this. Id.

If the PAI contract were cancelled and re-awarded to another contractor, important security missions involving nuclear testing, such as the NNSA 2030 Complex Initiatives, would likely be delayed for several months while a new contractor fully transitioned into the project. Id. at ¶ 11. This would cause irreparable harm to the operation of the NTS, NSO and the security of the United States. Id.

Therefore, granting Westech's request for injunctive relief would cause significant harm to the Government, whereas, Westech has not proven that it would suffer any harm if this Court does not grant its request for injunctive relief.

B. It Is Not In The Public Interest To Grant Westech's Request For Injunctive Relief

The public interest will be served by protecting national security interests. In Magellan Corp. v. United States, 27 Fed. Cl. 446, 448 (1993), this Court recognized that the Court must give due regard to national security:

> If we were dealing with a procurement for toilet seats or belt buckles, then delaying for three weeks a procurement that will evolve over three years would be *de minimus*. In this case, however, we are dealing with hardware that, according to General Garner, can give our armed forces a critical advantage in combat. In assessing the need for injunctions, the court must give due regard to the interests of national security. 28 U.S.C. § 1491(a)(3).

Here, we are dealing with a contract for security system services at a nuclear test site and office that is already being performed by PAI. As demonstrated in Section V.A, above, enjoining NNSA from continuing the PAI contract would create the risk of a security breach at the NSO and NTS, where classified activities are conducted and classified documents are stored, both of which affect national security interests. Additionally, as demonstrated above, if NNSA were required to reevaluate the proposals and the contract were awarded to another firm, important security missions involving nuclear testing would likely be delayed for months while a new contractor fully transitioned into the project, which would cause irreparable harm to the operation of the NTS and NSO and the security of the United States.

Therefore, it would not be in the public interest to grant Westech's requests for injunctive relief.

CONCLUSION

For these reasons, we respectfully request the Court to deny plaintiff's motion for judgment on the record and grant our cross-motion for judgment upon the administrative record.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

OF COUNSEL:
Don W. Crockett
Office of General Counsel
U.S. Department Of Energy
1000 Independence Ave., SW
Washington, D.C. 20585

/s/ William P. Rayel
WILLIAM P. RAYEL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tel. (202) 616-0302
Fax. (202) 307-0972

Attorneys for Defendant

June 4, 2007

CERTIFICATE OF FILING

I hereby certify that on this 4th day of June, 2007, a copy of the foregoing "DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ William P. Rayel