# In the United States Court of Federal Claims

No. 07-186C
(Filed Under Seal: October 24, 2007)
(Reissued: November 6, 2007)[1]

| | | |
|---|---|---|
| WESTECH INTERNATIONAL, INC., Plaintiff, v. THE UNITED STATES, Defendant. | * | Post-Award Bid Protest; DOE; NNSA; Cross-Motions for Judgment on the Administrative Record; RCFC 52.1; Probable Cost Adjustments; Bannum; Rational Basis. |

Carolyn Callaway, Albuquerque, NM, for plaintiff.

William P. Rayel, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Judge

This post-award bid protest action is before the court on the parties' cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiff, Westech International, Inc. ("Westech" or "plaintiff"), challenges an award to PAI Corporation ("PAI"), under a solicitation issued by the United States, acting through the Department of Energy, National Nuclear Security Administration ("DOE/NNSA" or "NNSA"). The solicitation was issued to provide Security System Services for the NNSA Nevada Site Office ("NNSA/NSO") and Nevada Test Site ("NTS").

Plaintiff asks this court to: declare the DOE/NNSA's award of the contract to PAI arbitrary, capricious, and without a rational basis; enjoin permanently PAI's performance of the contract; direct the DOE/NNSA to reevaluate offers under the solicitation and make a new award

---

[1] The court issued this Opinion and Order under seal on October 24, 2007. The court directed the parties to submit proposed redactions by November 5, 2007. Defendant, on behalf of both parties, submitted proposed redactions. The court has incorporated these redactions, which are indicated by brackets, into this reissued Opinion and Order, and has made two non substantive corrections brought to the court's attention by the parties.

decision; grant plaintiff costs and fees incurred in bringing this action; and grant plaintiff any other relief this court deems just and proper. For the reasons set forth below, Defendant's Cross-Motion for Judgment on the Administrate Record is granted, and Plaintiff's Motion for Judgment on the Administrative Record is denied.

## I. BACKGROUND[2]

### A. Solicitation

On April 18, 2005, the DOE/NNSA issued "a small business set-aside competitive solicitation," Solicitation Number DE-RP52-05NA99344 ("Solicitation" or "RFP"), for a contract to provide Security System Services for the NNSA/NSO. AR 1903. The "scope of work include[d] the Nevada Test Site (NTS), NSO Las Vegas metropolitan owned and/or leased facilities, and other facilities as assigned by NSO." Id. The NTS is "a 1,375 square-mile federal reservation located approximately 65 miles northwest of Las Vegas, Nevada." Id. The NTS "provides the supporting infrastructure, air space and utilities to serve the nation in developing innovative solutions to complex problems involving special nuclear material (SNM); hazardous materials; and multi-agency, integrated operations." Id. The facility "represents the United States' single, unique capability to support nuclear testing and major experiments that involve SNM or hazardous materials." Id. Further:

> Strong competencies such as nuclear safety and nuclear explosives safety and operations; remote field experiments and operations; first responder training; physical and environmental science; nuclear waste management systems and technology; design and fabrication of electronic, mechanical, and structural systems; remote and robotic sensing; management of a broad range of infrastructure, mining, engineering, and construction; and chemical, explosives, and hazardous materials systems and technology reside in the skilled employees of the NSO partnerships.

Id. Consequently, due to the highly sensitive nature of the research conducted at the DOE site, security is essential. Id.

The Solicitation sought offers for a cost-plus-fixed-fee, completion-type contract.[3] Id. at

---

[2] For purposes of ruling on the parties' cross-motions, the factual background is derived from the administrative record ("AR").

[3] "A cost-plus-fixed-fee contract is a cost-reimbursement contract that provides for payment to the contractor of a negotiated fee that is fixed at the inception of the contract." 48 C.F.R. § 16.306(a) (2005). A cost-plus-fixed-fee contract may take one of two forms: completion or term. Id. § 16.306(d). The completion-type contract "describes the scope of work by stating a definite goal or target and specifying an end product," id. § 16.306(d)(1), whereas the term-type contract "describes the scope of work in general terms and obligates the contractor to

61, 1903. The contract encompassed a transition period and a three-year base period with two, one-year option periods. Id. at 1903. The deadline for the submission of proposals was July 7, 2005. Id. at 50, 2309, 2335. An Amendment to the Solicitation was issued on each of the following dates: May 25, 2005; June 9, 2005; and June 30, 2005. See generally id. at 2228-2341.

The successful contractor would be required to: (1) perform Vulnerability Assessments ("VA"); (2) provide Operational Security Support ("OPSEC"); (3) prepare the NNSA/NSO Site Safeguards and Security Plans ("SSSP"); (4) provide Security Classification Administrative Support; (5) provide Physical Fitness Training; (6) provide Classified Matter Staffing and Administrative Support; (7) perform Pass and Badging services; and (8) provide Other Security Support.[4] Id. at 67-69. A proposal was to be submitted in three volumes: Offer and Other Documents; Technical Proposal; and Cost Proposal. Id. at 52.

### B. Evaluation Criteria and Methodology

#### 1. Evaluation Criteria

The Solicitation provided that the acquisition would be conducted in accordance with the policies and procedures set forth in Federal Acquisition Regulation ("FAR") Part 15 and DOE Acquisition Regulation Part 915,[5] id. at 63; and that the contract would be awarded on a best value basis[6] after evaluation in accordance with the factors and subfactors in the solicitation, id. at 47. Because the government intended to evaluate proposals and award the contract based on the factors in the Solicitation and without discussions with offerors,[7] offerors were advised that

---

devote a specified level of effort for a stated time period." Id. § 16.306(d)(2).

[4] The Statement of Work ("SOW") for the Other Security Support element was divided essentially into (1) tasks regarding Information Technology ("IT")/Website Support and (2) tasks regarding Security Education/Safeguards and Security ("S&S") Professional Training. AR 69-70.

[5] Part 15 of the FAR, 48 C.F.R. §§ 15.000-.609, "prescribes the policies and procedures governing competitive and noncompetitive negotiated acquisitions." 48 C.F.R. § 15.000. The DOE Acquisition Regulation implements and supplements the FAR and is used in conjunction with the FAR. Id. § 901.101.

[6] The Solicitation defined "best value" as "the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement." AR 64 (citing 48 C.F.R. § 2.101).

[7] The government reserved the right to hold discussions if the contracting officer later determined discussions were necessary. AR 47.

their initial proposal should reflect the best terms from a cost or price and technical standpoint. Id.

The four evaluation criteria, in order of descending importance, were: Key Personnel, Technical Capability, Past Performance, and Cost.[8] Id. at 64-65. The Solicitation noted that in determining the best value to the government, the Key Personnel, Technical Capability, and Past Performance proposal evaluation criteria were significantly more important than the Cost Evaluation Criteria. Id. at 64; see also id. at 65 ("The Cost Evaluation Criteria [are] significantly less important" than the other three criteria). At the Preproposal Conference with potential offerors, the government's representative advised that approximately 40 to 50 Full-Time Equivalent ("FTE") employees would be associated with the contract.[9] Id. at 2180, 2202.

**a. Technical Evaluation Criteria**

In evaluating the proposals, the Technical Evaluation Criteria were assigned the following weight: Key Personnel, assessed 45 points; Technical Capability, assessed 40 points; and Past Performance, assessed 15 points. Id. at 1910. There were no subcriteria. Id. at 65.

**i. Technical Evaluation Criterion 1 - Key Personnel**

The Solicitation identified four positions for Key Personnel: Program Manager; Vulnerability Assessments Manager ("VA Manager"); Operational Security Manager ("OPSEC Manager"); and Site Safeguards and Security Plan Manager ("SSSP Manager"). Id. at 40. Key Personnel were required to be "highly qualified" and "demonstrate the ability to effectively manage a program of the nature, size and scope of the work required in the [SOW]." Id. at 55. The offeror's proposed Key Personnel would be evaluated on "their qualifications, currency and relevancy of experience, attainment of advanced degrees in related disciplines, and demonstrated technical expertise, in the specific positions for which they are proposed. Currency and relevancy of experience is significantly more important than education." Id. Further, the Program Manager position was "considered significantly more important" and would be "given more weight in the evaluation than any other key personnel." Id. Finally, the offeror's Key Personnel were required to submit signed and dated letters of commitment, at agreed upon salary and benefits packages, and their resumes had to demonstrate that their experience and

---

[8] Key Personnel, Technical Capability, and Past Performance were considered "Technical Evaluation Criteria." AR 65. Cost reasonableness, realism, and completeness comprised the "Cost Evaluation Criteria." Id. at 66.

[9] However, the "General Questions and Answers" section stated that the government had not "released a 'forecasted' required number of FTEs for any activities on this contract. [The government] assum[ed] that capable offerors [would] be able to understand and interpret the requirements as outlined in the Statement of Work . . . and propose accordingly based upon their own unique approach and expertise." AR 2398.

qualifications made them well-suited for the proposed positions. Id.

**ii. Technical Evaluation Criterion 2 - Technical Capability**

In evaluating the offeror's Technical Capability, the NNSA considered four facets of the proposal. First, the offeror had to explain how its technical approach would successfully accomplish the SOW. Id. at 55, 65. In evaluating the offeror's technical approach, the NNSA would consider "whether the Offeror[] . . . demonstrate[d] a thorough understanding of any technical risks and their impact associated with performance of the contract, as well as the Offeror's approach for minimizing those risks." Id. at 65. Second, the NNSA would consider the offeror's ability to "provide a highly trained professional nucleus of employees who possess the necessary skills and flexibility to perform the SOW." Id. at 55. Third, a description of the offeror's corporate experience in performing all aspects of the SOW would be considered. Id. Finally, the NNSA would evaluate the offeror's transition plan, which had to include a description of the "proposed transition activities that will mitigate the risk to the continuity of operations of critical NNSA NSO and Nevada Test Site Security missions and tasks." Id.

**iii. Technical Evaluation Criterion 3 - Past Performance**

Finally, the Solicitation required an offeror to include information regarding its past performance for contracts completed or in process during the last five years and in place for at least three months where the work was relevant to the SOW. Id. at 56. An offeror also was expected to provide a self-assessment of its relevant past performance and was encouraged to provide information in the self-assessment on problems it encountered and the measures it implemented to resolve the problems. Id.

As explained in the pertinent regulation, "[p]ast performance is one indicator of an offeror's ability to perform the contract successfully." 48 C.F.R. § 15.305(a)(2)(i). As such, past performance evaluations would examine "[t]he currency and relevance of the information, source of the information, context of the data, and general trends in [the] contractor's performance." Id. For an offeror who did not have a relevant record of past performance, the NNSA would evaluate the offeror as neither favorable nor unfavorable, and would give the offeror a neutral rating. AR 65; see also 48 C.F.R. § 15.305(a)(2)(iv) ("In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on past performance.").

**b. Cost Evaluation Criteria**

In addition to the Technical Evaluation Criteria, the Solicitation also stated that Cost Evaluation Criteria would be applied in order to determine the best value to the government. AR 66. As such, an offeror's cost proposal would be evaluated in accordance with FAR § 15.404 to determine "cost reasonableness, realism, and completeness." Id. The Solicitation provided:

> NNSA will determine a probable cost estimate to use as the total evaluated cost. The amount that will be used as the evaluated cost or price for purposes of the best value determination will be the sum of the proposed fee, the evaluated cost for the transition period, and the evaluated cost of the total effort (including option periods) for contract performance after the transition period.

Id.

To determine reasonableness, the NNSA would evaluate the cost proposal for "the appropriateness of the underlying assumptions and estimating techniques used to generate the proposed costs, and the consistency of those assumptions and techniques with the proposed accomplishment of the required work." Id. Second, in analyzing cost realism, the cost proposal would be evaluated to ascertain if the "proposed costs are realistic for the work to be performed, reflect a clear understanding of the SOW requirements, and are consistent with the various elements of the offeror's Technical Proposal." Id. The NNSA would utilize a cost realism analysis to calculate the probable cost of each offeror's proposal in order to evaluate best value. Id. "Probable cost is determined by adjusting each Offeror's proposed costs to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis." Id.; see also 48 C.F.R. § 15.305(a)(1) (stating that when "contracting on a cost-reimbursement basis, evaluations shall include a cost realism analysis to determine what the Government should realistically expect to pay for the proposed effort, the offeror's understanding of the work, and the offeror's ability to perform the contract"). Finally, for cost completeness, each proposal would be evaluated based upon the submission requirements contained in the Solicitation's cost instructions. AR 66.

As explained above, the Cost Evaluation Criteria were considered "significantly less important" than the Technical Evaluation Criteria (Criteria 1 through 3). Id. at 65, 2508. That lesser degree of significance notwithstanding, the Solicitation cautioned that "[i]nconsistencies between the Cost Proposal and other portions of the proposal could raise concerns regarding the Offeror's understanding of the requirements and ability to perform the work for the proposed cost." Id. at 66. Indeed, offerors were advised that it was within the discretion of the NNSA to construe an "unrealistic, unreasonable, or incomplete cost proposal . . . [as] evidence of the offeror's lack of or poor understanding of the requirements of the solicitation, . . . thus . . . adversely affect[ing] the offeror's rating on the Technical Proposal criteria." Id.

**2. Evaluation Methodology**

The Source Evaluation Board ("SEB") was tasked to evaluate the proposals in accordance with FAR Part 15 and the Technical and Cost Evaluation Criteria published in the RFP. Id. at 1907. During the evaluation process, the SEB used a Source Selection Plan, which had been approved by the Source Selection Authority ("SSA"). Id. The Voting Members of the SEB "developed a consensus evaluation of the strengths . . . , significant strengths . . . , weaknesses . .

. , significant weaknesses . . . , and deficiencies . . ." of the proposals.[10] Id. The Voting Members then assigned a consensus point score for each responsive technical proposal using the following method. Each Voting Member reviewed and assessed the technical proposal against the relevant evaluation criterion. Id. at 1908. After independent evaluation, the Voting Members of the SEB compared their respective findings to achieve a consensus of the strengths, weaknesses, and deficiencies for each criterion. Id. Risks were "evaluated as a component of weaknesses and deficiencies." Id. Once a consensus was reached, the SEB assigned a rating for each criterion using the adjectival ratings, defined below. Id. Next, the SEB assigned each criterion a percentage. Id. The percentage was then multiplied by the weight assigned to the criterion, and this numeric value was the final score for the criterion. Id. This process was repeated for each criterion for each offeror. Id. The final weighted point scores were then tallied to arrive at a total score for the technical proposal. Id.

The adjectival rating definitions were as follows:

> **Excellent:** The proposal demonstrates an excellent understanding of contractual requirements and capability to perform the contractual work. The proposal contains strengths, including significant strengths, which appreciably outweigh any weaknesses. No deficiencies exist.
>
> **Good:** The proposal demonstrates a good understanding of contractual requirements and capability to perform the contractual work. The proposal contains strengths that outweigh any weaknesses. No deficiencies exist.
>
> **Marginal:** The proposal demonstrates a marginal understanding of contractual requirements and capability to perform the contractual work. The proposal contains weaknesses, including significant weaknesses, which outweigh strengths. No more than one deficiency exists.
>
> **Poor:** The proposal demonstrates a poor understanding of contractual requirements and capability to perform the contractual work. The proposal contains weaknesses, including significant weaknesses, which appreciably outweigh strengths. One or more deficiencies exist.

---

[10] "Strength" is "an attribute in the proposal that increases the potential of successful contract performance." AR 64. "Significant strength" is "an attribute that appreciably increases the potential of successful contract performance." Id. "Weakness" is "a flaw in the proposal that increases the risk of unsuccessful contract performance." Id. "Significant weakness" is "a flaw that appreciably increases the risk of unsuccessful contract performance." Id. "Deficiency" is "a material failure of the proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." Id.

> **Neutral:** For evaluation of Past Performance Only. The Offeror lacks a record of relevant or available past performance history. The Offer is evaluated as neither favorably nor unfavorably on past performance.

Id. at 63-64. Adjectival ratings were assigned in accordance with the following:

| Adjective | Percentage of Available Points |
|---|---|
| Excellent | 85 to 100 |
| Good | 70 to 84 |
| Marginal | 55 to 68 |
| Poor | 0 to 54 |
| Neutral (past performance only) | 69 |

Id. at 1908.

### C. Award

The NNSA received fourteen proposals by the July 7, 2005 deadline. Id. at 2508. A competitive range was established on September 22, 2006, of the five most highly rated offerors: Santa Fe Protective Services ("Santa Fe"); Gregg Protection Services; Protection Strategies, Incorporated ("PSI"); Westech; and PAI. Id. at 1906-07; see also id. at 1265 (letter from the contracting officer to the President and CEO of Westech informing Westech that its "proposal was among the most highly rated proposals and is included in the competitive range"). As noted above, while the Solicitation stated that award would be made without discussions, the government reserved the right to conduct discussions. Id. at 47. Thus, "[g]iven the number of highly rated technical proposals, and the significant variations in the offerors' proposed costs, the Contracting Officer determined that it would be advantageous to the Government to conduct discussions to maximize the ability of the selection official to make a best value source selection." Id. at 1907.

On September 23, 2006, the government sent its first discussion letter to offerors in the competitive range, identifying concerns and providing offerors the opportunity to explain their proposals. See id. at 343-48, 1265-71. The September 23, 2006 discussion letter asked Westech to, amongst other things, provide a staffing summary specifying the SOW areas that each FTE would perform, elaborate on the proposed Program Manager's experience, and elaborate on how Westech would accomplish the VA SOW.[11] Id. at 1267. Each offeror submitted a revised proposal on October 6, 2006. Id.

[11] The September 23, 2006 discussion letter also raised concerns regarding Westech's proposed staffing for the OPSEC SOW and the Classified Matter Staffing and Administrative Support SOW. AR 1267-68. The letter further asked Westech to clarify how approximately 0.2 FTE would be sufficient for the IT/Website Support Category, under the Other Security Support SOW, for the entire contract period. Id. at 1269.

Upon examination of the revised proposals, the SEB sought additional information from the four remaining offerors.[12] Id. Then, in a November 2, 2006 discussion letter, the government provided its staffing estimate to the four offerors and asked each to substantiate any deviations from the government's estimate in accordance with the offeror's technical approach. See id. at 556-57, 1601-02; see also id. at 1907 (requesting information regarding "the number of FTEs proposed in relation to the Government[']s estimate of FTEs necessary for accomplishing the SOW requirements"). The breakdown was as follows:

| | |
|---|---|
| Program Management | 1 |
| Vulnerability Assessments | 3 |
| Operational Security/Security Classification Administrative Support/ Classified Matter Staffing and Administrative Support/Other Security Support | 9 |
| Site Safeguards and Security Plan | 3 |
| Physical Fitness Training | 12 |
| Pass and Badging | 5 |
| Total | 33 |

Id. at 1601.

The information requested by the SEB was submitted by the offerors on November 9, 2006. Id. at 1907. On December 4, 2006, the SEB issued its Final Evaluation Report ("Report"). Id. at 1898-1982. The awardee, PAI, received an overall technical score of 90.20 (Excellent),[13] while Westech's overall technical score was [ ] (Good).[14] Id. at 1910.

[12] Gregg Protection Services was eliminated from the competition "due to an actual or apparent conflict of interest involving the proposed Program Manager." AR 1907.

[13] [ ] and PSI also rated overall as "Excellent," receiving scores of [ ] and 90.50, respectively. AR 1910.

[14] The SEB's evaluation scores were:

| Offeror | Key Personnel 45 Points | Technical Capability 40 Points | Past Performance 15 Points | Total 100 Points | Final Proposed Cost ($) | Probable Cost ($) |
|---|---|---|---|---|---|---|
| Santa Fe | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| PSI | [ ] | [ ] | [ ] | 90.50 | [ ] | [ ] |
| PAI | [ ] | [ ] | [ ] | 90.20 | 22,088,411 | 22,093,871 |
| Westech | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |

Ms. Debby C. Miller, the SSA, then reviewed the SEB's Report. See id. at 1983-90. Because she was satisfied that the SEB utilized the established criteria in performing the evaluations of the proposals and satisfied the requisites of the Source Selection Plan and applicable laws and regulations, the SSA concurred with the SEB's ratings and probable cost determinations. Id. at 1986. For Key Personnel, the most heavily weighted criterion, the SSA noted that although Westech was rated as "Excellent," there was a "discernable difference between Westech and the other three Offerors." Id. at 1987. Westech was evaluated lower than the others because its proposed Program Manager was considered "Neither a Strength nor Weakness." Id. (finding that Westech's proposed Program Manager did not demonstrate that he possessed the breadth of experience and technical expertise necessary for the position); see also id. (stating that the remaining three offerors were rated either as "[ ]" or "[ ]" for the Program Manager position). For Technical Capability, the second most heavily weighted criterion, the SSA discussed Westech's technical approach and expressed "concern[] that Westech's shortfall in its proposed staffing, without adequate explanation, could adversely affect successful performance of [some of the] SOW elements." Id.; see also id. at 1911 ("Westech was rated lower because in evaluating its Technical Approach, the SEB identified weaknesses in some SOW areas."). Additionally, the SSA was concerned that "Westech's approach to VAs could compromise the role of the Federal personnel in providing independent oversight of the contractor." Id. at 1987. Lastly, the SSA evaluated the Past Performance criterion, the least weighted criterion, and noted that Westech was "slightly higher than the other three Offerors . . . because it had more contracts that were considered either significant strengths or strengths." Id.

Based on her analysis of the Technical and Cost Evaluation Criteria, the SSA compared Westech's proposal against the other three offerors:

> Overall, even though Westech's proposed OPSEC, VA and SSSP Managers have extensive breadth of experience in each of their respective areas, I find that Westech's Program Manager demonstrated a lesser breadth of experience and technical expertise than the Program Managers proposed by Santa Fe, PSI and PAI. The technical approach proposed by an offeror is also an important aspect of successful contract performance. I find that Westech's overall technical approach increases the risk of unsuccessful contract performance. Specifically, Westech's labor understaffing, without adequate explanation, is a very serious concern of mine. I am also concerned that Westech's approach to VAs could compromise the role of the Federal personnel in providing independent oversight of the contractor. Although Westech was rated the highest in Past Performance, I do not find that this past performance strength overcomes those risks to successful performance of the

---

| | | | |
|---|---|---|---|
| Excellent (85-100%) | Good (70-84%) | Marginal (55-68%) | Poor (0-54%) |

AR 1985.

> SOW. Accordingly, I find these risks are a significant discriminator between Westech and the other three Offerors.

Id. Thus, the SSA concluded that "[t]his shortcoming in Westech's technical proposal does not merit award at a lower probable cost relative to the other three Offeror[s'] cost proposals." Id. at 1989.

Based on her evaluation, the SSA found that PAI's proposal represented the best value to the government. Id. On December 6, 2006, PAI and Westech were notified that PAI would be awarded the contract. Id. at 1991-92, 2013-14. On December 7, 2006, award was made to PAI. Id. at 2077.

**D. Procedural History**

The NNSA's December 6, 2006 letter to Westech advising that PAI had been awarded the contract also informed Westech that, pursuant to FAR § 15.506(a)(1), Westech could request a debriefing within three days after receipt of that letter. Id. at 2013. The letter further informed Westech that if it preferred an oral debriefing, the SEB had reserved January 2007 for the meeting. Id. By letter dated December 6, 2006, Westech made its request for a debriefing,[15] id. at 2041, and by letter dated December 11, 2006, Westech advised the NNSA that only an oral debriefing would permit the company to "make business decisions as a result of this source selection." Id. at 2042. The NNSA conducted the requested debriefing on January 31, 2007. Id. at 2056.

On March 20, 2007, plaintiff filed its Post-Award Procurement Protest Complaint in this court. On March 22, 2007, the court held a status conference with the parties, and, in accordance with the parties' proposal, directed defendant to file the administrative record by April 10, 2007.[16] The court also directed the parties to file a joint status report by April 17, 2007, to propose briefing deadlines. The dates suggested were adopted by the court. On May 13, 2007, plaintiff filed its Motion for Judgment on the Administrative Record ("Motion" or "Pl.'s Mot."). Defendant filed its Cross-Motion for Judgment on the Administrative Record and Response to Plaintiff's Motion ("Cross-Motion" or "Def.'s Cross-Mot.") on June 4, 2007. Plaintiff filed its Reply and Response to Defendant's Cross-Motion ("Pl.'s Reply & Resp.") on July 1, 2007. Defendant filed its Reply on July 16, 2007. Counsel advised that October 25, 2007, was the earliest available date for oral argument, but the court deems it unnecessary.

---

[15] The Solicitation provided that during the debriefing, the government was required to disclose information such as "[t]he agency's evaluation of the significant weak or deficient factors in the debriefed offeror's offer"; "[t]he overall evaluated cost or price and technical rating of the successful and the debriefed offeror and past performance information on the debriefed offeror"; and a "summary of the rationale for award." AR 47-48.

[16] The administrative record was filed on April 10, 2007, and a supplement to the administrative record was filed on May 3, 2007.

In its Cross-Motion, defendant moved to supplement the administrative record with a declaration from Patricia M. Bodin ("Ms. Bodin"), a Security Team Lead for the Assistant Manager for S&S at the NSO ("Motion to Supplement"). Def.'s Cross-Mot. 30 n.13. On July 1, 2007, plaintiff filed its Opposition to Defendant's Motion to Supplement ("Opposition") and Motion to Strike Declaration and Section V of Defendant's Cross-Motion ("Motion to Strike"). On July 16, 2007, defendant filed its Reply to Plaintiff's Opposition, and its Response to Plaintiff's Motion to Strike. Lastly, on July 23, 2007, plaintiff filed its Reply to Defendant's Response to Plaintiff's Motion to Strike.

## II. THE PARTIES' ARGUMENTS

### A. Plaintiff's Assertions

Plaintiff first asserts that the NNSA erred by making upward adjustments to its proposed costs in the amount of $2,843,725. Pl.'s Mot. 15. Specifically, plaintiff claims that five areas were adjusted over the length of the contract by the NNSA without a rational basis: (1) an increase of [ ] for adding 0.8 FTE[17] for a Subject Matter Expert ("SME") Consultant;[18] (2) an increase of [ ] to substitute a VA SME for an administrative person;[19] (3) an increase of [ ] to add 15,342

---

[17] In its proposal, Westech stated that 1.0 FTE equaled 1,860 labor hours. AR 1663. To arrive at this number, Westech assumed a 40-hour workweek multiplied by 52 weeks per year (40 hours x 52 weeks = 2,080 hours). Id. Westech then subtracted [ ] to arrive at 1,860 hours per year (2,080 hours - [ ] = 1,860 hours). Id.

[18] In its Motion, plaintiff explained how it calculated the five increases it contests. The calculations were based on the NNSA's cost analysis of Westech's proposal and, where appropriate, encompass the five contract years. See generally AR 1853-69. Plaintiff's calculation for the additional 0.8 FTE for five years is as follows:

| | |
|---|---|
| Cost for 0.8 FTE SME Consultant: | [ ] (7,440 hours x [ ] per hour) |
| Material & Subcontracts ("M&S") at [ ]: | [ ] |
| Total: | [ ] |

Pl.'s Mot. 18.

[19] Plaintiff's calculation for the cost of substituting the VA administrative support person with a VA SME is as follows:

| | |
|---|---|
| Labor: | [ ] |
| Overhead at [ ]: | [ ] |
| Subtotal: | [ ] |
| General & Administrative ("G&A") at [ ]: | [ ] |
| Total: | [ ] |

labor hours (approximately 1.7 FTEs per year) to match the government estimate;[20] (4) an increase of [ ] to escalate wages for plaintiff's employees covered by the Service Contract Act, 41 U.S.C. §§ 351-358 (2000),[21] at three percent;[22] and (5) an increase of [ ] to the

---

Pl.'s Mot. 18. Plaintiff's Motion states that the G&A costs are "[ ]"; however, [ ] of [ ] is [ ].

[20] Plaintiff's calculation for the additional labor hours is based on the following computation:

| | |
|---|---|
| Labor: | [ ] |
| Overhead at [ ]: | [ ] |
| Subtotal: | [ ] |
| G&A at [ ]: | [ ] |
| Total: | [ ] |

Pl.'s Mot. 18.

[21] The Service Contract Act requires that most government service contracts contain clauses that protect workers' wages and fringe benefits. See 41 U.S.C. § 351(a). Specifically, the Service Contract Act directs the Secretary of Labor ("Secretary") to issue special minimum wage orders, called "Wage Determinations," for each class of service worker employed in a particular locality, and it prohibits contractors/employers from paying less than the Secretary's Wage Determinations. Id. § 351(a)(1). Another Service Contract Act provision applies to fringe benefits. Id. § 351(a)(2).

[22] The following is plaintiff's calculation for the three percent escalation for Service Contract Act positions:

| | |
|---|---|
| Labor Escalation: | [ ] |
| Overhead at [ ]: | [ ] |
| Subtotal: | [ ] |
| G&A at [ ]: | [ ] |
| Total: | [ ] |

Pl.'s Mot. 18. Plaintiff's Motion reflects that the total is [ ]; however, upon rounding up to the nearest dollar, the total is [ ].

subcontractor's costs for a three percent escalation for Service Contract Act positions.[23] [24] Pl.'s Mot. 16-18.

Second, plaintiff maintains that the NNSA penalized plaintiff "twice for the same perceived deficiency in staffing: once by downgrading Westech's technical score and again by evaluating Westech at the higher probable cost which included adding the staff by which NNSA believed Westech fell short." Id. at 15; see also id. at 32 (arguing that the NNSA's "double penalty" prejudiced plaintiff). Thus, plaintiff asks this court to: (1) declare the NNSA's award of the contract to PAI "arbitrary, capricious, an abuse of discretion, and not in accordance with the law"; (2) impose a permanent injunction against PAI's performance of the contract; (3) direct the reevaluation of offers and a new award decision; and (4) grant plaintiff costs and fees incurred in pursuing this action and bid proposal expenses incurred in responding to the Solicitation. Id. at 33.

**B. Defendant's Response**

Defendant contends that the administrative record demonstrates that the NNSA did not commit error in weighing plaintiff's proposal and making necessary adjustments. Def.'s Cross-Mot. 6. According to defendant, the NNSA rationally downgraded plaintiff's technical rating, as well as increased plaintiff's probable cost, in accordance with the Solicitation and precedent, because of plaintiff's understaffing. Id. Even assuming plaintiff could establish that the NNSA committed

---

[23] Plaintiff's calculation for the three percent increase for the subcontractor's Service Contract Act positions is:

| | |
|---|---|
| Subcontract Cost: | [ ] |
| M&S at [ ]: | [ ] |
| Total: | [ ] |

Pl.'s Mot. 18.

[24] Plaintiff's Motion notes that the total of these five increases is approximately $196 less than the NNSA's total probable cost for Westech's proposal, AR 1853, and the difference is likely the result of the NNSA's use of a higher overhead rate for contract year 2007 than for the remaining years of the contract. Pl.'s Mot. 18 n.6; see also AR 1854, 1864, 1867 (reflecting that the overhead rate used for contract year 2007 was [ ], while the rate used for the remaining contract years was [ ]).

Defendant disagrees with some of plaintiff's calculations. Defendant points out that plaintiff added the three percent escalation in wages to the VA SME and 1.7 additional FTEs; however, defendant states that because plaintiff is challenging the three percent escalation, the analysis instead should be as follows: [ ]. Def.'s Cross-Mot. 11 n.3. The parties' differences in characterizing the amounts are inconsequential. The parties agree that the NNSA added approximately $2.8 million in probable costs. Id. at 5; Pl.'s Mot. 17.

error, defendant argues that plaintiff cannot succeed because it failed to establish that the NNSA's alleged errors were significant enough to prejudice plaintiff. Id. at 6-7. Lastly, defendant claims that "the harm to the NTS, NSO and national security would greatly outweigh any harm to Westech and granting Westech's requests for injunctive relief would not be in the public interest." Id. at 7. Thus, defendant maintains that plaintiff is not entitled to a permanent injunction. Id.

## III. LEGAL STANDARDS

### A. Jurisdiction

The United States Court of Federal Claims ("Court of Federal Claims") possesses jurisdiction over post-award bid protest cases pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (2000). Specifically, the Tucker Act provides that the Court of Federal Claims "shall have jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Id. § 1491(b)(1). Further, the Tucker Act permits the Court of Federal Claims to "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." Id. § 1491(b)(2).

### B. Standard for Bid Protest Challenges

The standard for review of a bid protest case is set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2000), which provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir. 2004) (same); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (same); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (same).

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has interpreted this standard to hold that, "'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting Impresa, 238 F.3d at 1332). When a protestor challenges the decision on the first ground, the test is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." Id. (citation omitted). When challenging a procurement on the ground of a regulatory violation, the protestor "must show a clear and prejudicial violation of [the] applicable statutes or regulations." Id. Therefore, "an agency's procurement decisions will be upheld unless shown to be 'arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.'" Process Control Techs. v. United States, 53 Fed. Cl. 71, 75 (2002) (quoting 5 U.S.C. § 706); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (holding that a trial court initially must determine if the government "acted without rational basis or contrary to law when evaluating the bids and awarding the contract").

The Competition in Contracting Act of 1984, Pub. L. No. 98-369, 98 Stat. 1175, mandates that agencies evaluate sealed bids and competitive proposals, and award a contract, based on the factors specified in the solicitation. 41 U.S.C. § 253b(a) (2000); see also 48 C.F.R. § 15.608(a) (requiring proposals to be evaluated "solely on the factors specified in the solicitation"). Accordingly, if an agency fails to comply with the terms of the solicitation, such failure may "constitute grounds for overturning the bid award." Advanced Data Concepts, Inc. v. United States, 43 Fed. Cl. 410, 417 (1999), aff'd, 216 F.3d 1054. Therefore, when the court finds a "reasonable basis" for an agency's action, the court should "stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (citation omitted). "This standard recognizes a zone of acceptable results in each particular case and requires that the final decision reached by an agency is the result of a process that 'consider[s] the relevant factors' and is 'within the bounds of reasoned decision making.'" Mgmt. Solutions & Sys., Inc. v. United States, 75 Fed. Cl. 820, 827 (2007) (quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983)); see also Impresa, 238 F.3d at 1333-34 ("[T]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." (citation and internal quotations omitted)). Because the standard requires this court to review the reasonableness of the agency's decision, instead of its correctness, the court "must exercise restraint in examining information that was not available to the agency." ARINC Eng'g Servs., LLC v. United States, 77 Fed. Cl. 196, 200-01 (2007). Thus, this court will interfere with the government procurement process "only in extremely limited circumstances." CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983).

Further, negotiated procurements allow a "breadth of discretion" to the contracting officer, thus imposing a heavier burden of proof on the protestor. Burroughs Corp. v. United States, 617 F.2d 590, 597-98 (Ct. Cl. 1980). Similarly, "best value" contract awards afford a contracting officer more discretion than awards based solely on price. Galen Med. Assocs., 369 F.3d at 1330; see also E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."). As such, the protestor's burden is especially heavy in negotiated, best value procurements. Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 380 (2003), aff'd, 365 F.3d 1345. An agency's decision is afforded even greater weight when a trial court is asked to review a technical evaluation. See E.W. Bliss, 77 F.3d at 449 ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."); Omega World Travel, Inc. v. United States, 54 Fed. Cl. 570, 578 (2002) ("It is

well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals." (citing E.W. Bliss, 77 F.3d at 449)). Thus, "where an agency's decisions are highly technical in nature, . . . judicial restraint is appropriate and proper." Electro-Methods, Inc. v. United States, 7 Cl. Ct. 755, 762 (1985).

If a trial court determines that an agency's decision-making "fails an APA review under 5 U.S.C. § 706(2)(A)," the court must then determine whether the government's conduct prejudiced the protestor. See Bannum, 404 F.3d at 1351. "'[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.'" Galen Med. Assocs., 369 F.3d at 1330 (quoting Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996)). Prejudice, in this context, requires the protestor to show a "substantial chance" that it would have received the contract award, but for the APA error. See Bannum, 404 F.3d at 1358 ("To establish prejudice, Bannum was required to show that there was a 'substantial chance' it would have received the contract award but for the . . . errors in the bid process."). While an agency's failure to comply with the terms of the solicitation may serve as grounds for rejecting a bid award, Keco Indus., Inc. v. United States, 492 F.2d 1200, 1206 (Ct. Cl. 1974), not all errors require a court to reject an agency's decision. SMS Data Prods. Group, Inc. v. United States, 900 F.2d 1553, 1557 (Fed. Cir. 1990) (stating that, for example, a harmless error "does not make a bid unacceptable"); see also Andersen Consulting Co. v. United States, 959 F.2d 929, 932 (Fed. Cir. 1992) (stating that "overturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations"); Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 622 (2002) ("[M]inor errors or irregularities, i.e., harmless errors, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision." (citation omitted)).

Finally, not every violation of the APA mandates an equitable remedy; rather, a court must consider other relevant factors, such as the public interest, in granting injunctive relief. PGBA, LLC v. United States, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004) (stating that "injunctive relief [does] not issue as a matter of course"). In PGBA, the Federal Circuit affirmed a ruling by the Court of Federal Claims where a protestor's claim for injunctive relief was denied on "public interest grounds," though the plaintiff succeeded in establishing prejudicial error in the procurement process. Id. at 1223 (stating that the agency "made several prejudicial errors in its evaluations of the technical merits of PGBA's and WPS's proposals . . . however, the [Court of Federal Claims] concluded that the balance of hardships and the public interest favored allowing [the agency] and WPS to proceed with the contract"). Thus, an agency's error does not necessarily require the trial court to impose equitable relief, but instead requires the court to decide whether to issue the injunction. Id. at 1228-29 (listing the traditional four factors that the trial court should use in determining whether to issue a permanent injunction: "(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief"). Because injunctive relief is relatively "drastic in nature," a

plaintiff must establish that its right to such relief is clear. See Banknote Corp., 56 Fed. Cl. at 380-81; see also Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 566 (2000).

### C. Standing

The court must first address standing because it is a "threshold requirement in every federal action." Sicom Sys. Ltd. v. Agilent Techs., Inc., 427 F.3d 971, 975-76 (Fed. Cir. 2005). Standing to bring a bid protest challenge as an "interested party" is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract." Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001). "The term 'interested part[y]' excludes those who did not submit proposals, bidders who withdrew from a solicitation, and offerors who were not competitively ranked for the award." Microdyne Outsourcing, Inc. v. United States, 72 Fed. Cl. 230, 232 (2006) (citing Impresa, 238 F.3d at 1334). In the case sub judice, Westech's proposal was determined to be within the competitive range, AR 1906-07; thus, plaintiff has demonstrated that it qualifies as a protestor whose direct economic interest was affected by the award to PAI. Plaintiff, therefore, satisfies the standing requirement.

### D. Judgment on the Administrative Record

Pursuant to RCFC 52.1, the Court of Federal Claims reviews an agency decision based on the administrative record. Bannum, 404 F.3d at 1356.[25] The standard for judgment on the administrative record, given all the disputed and undisputed facts in the administrative record, is whether the plaintiff has met the burden of proof to show that the decision was not in accordance with law. A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006); see also Bannum, 404 F.3d at 1357 (instructing the court to make "factual findings under RCFC 52.1 from the [limited] record evidence as if it were conducting a trial on the record"). "The resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). Contrary to a summary judgment proceeding, a genuine issue of material fact will not foreclose judgment on the administrative record. Bannum, 404 F.3d at 1356.

---

[25] The decision in Bannum was based upon RCFC 56.1, which was abrogated and replaced by RCFC 52.1. However, RCFC 52.1 was designed to incorporate the decision in Bannum. See RCFC 52.1, Rules Committee Note (June 20, 2006).

## IV. DISCUSSION

### A. The NNSA's Cost Realism Analysis Was Rationally Based.

For a cost-reimbursement contract, such as the one in the case sub judice, the regulations require that a cost realism analysis be performed to determine the probable cost of performance for each offeror.[26] 48 C.F.R. § 15.404-1(d)(2). A cost realism analysis is:

> the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

Id. § 15.404-1(d)(1). As noted above, the Solicitation stated that each offeror's proposal would be evaluated based on cost reasonableness, realism, and completeness. AR 66. In accordance with the Solicitation, the NNSA performed a cost realism analysis to determine the probable cost of each offeror's proposal in order to evaluate best value. Id. As provided in the regulations, probable cost was established by adjusting the offeror's "proposed costs to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis." Id.

As discussed above, plaintiff alleges that the NNSA's cost realism adjustments to Westech's proposal lacked a rational basis in five areas: (1) the addition of 0.8 FTE for an SME Consultant; (2) the substitution of a VA SME for an administrative person; (3) the increase of labor hours (approximately 1.7 FTEs) to match the government estimate; (4) the increase of wages for plaintiff's employees covered by the Service Contract Act; and (5) the increase of a subcontractor's costs for a three percent escalation for Service Contract Act positions. Pl.'s Mot. 17-27. In its Final Proposal Revision, Westech offered a price of [ ], AR 1985, which represents 30 FTEs among Westech and its subcontractors Polestar Applied Technologies

---

[26] The regulation further provides that:

> (i) The probable cost may differ from the proposed cost and should reflect the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal. The probable cost shall be used for purposes of evaluation to determine the best value.
>
> (ii) The probable cost is determined by adjusting each offeror's proposed cost, and fee when appropriate, to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis.

48 C.F.R. § 15.404-1(d)(2)(i)-(ii).

("Polestar") and Corporate Allocation Services ("CAS"). Id. at 1956. However, the government estimated that Westech's probable cost would be [ ], an increase of $2,843,725 to Westech's final proposed cost. Id. at 1985.

In order to overturn the agency's cost realism determination, plaintiff must establish that the NNSA's decision lacked a rational basis. JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 393 (2001); see also CTA, Inc. v. United States, 44 Fed. Cl. 684, 693 (1999) ("'Decisions on cost realism are within the agency's sound discretion and expertise, and the judgment will not be overturned absent any rational basis.'" (citation omitted)). While an agency's cost realism analysis need not have been performed with "impeccable rigor" to be rational, OMV Med., Inc. v. United States, 219 F.3d 1337, 1344 (Fed. Cir. 2000), the analysis must reflect that the agency considered the information available and did not make "irrational assumptions or critical miscalculations." Id.; see also United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 329 (2003) ("'Because the agency is in the best position to make this cost realism determination, our review is limited to determining whether its cost evaluation was reasonably based and not arbitrary.'" (citation omitted)). Finally, in the context of a best value procurement, the court's consideration of the NNSA's decision is particularly deferential. See Galen Med. Assocs., 369 F.3d at 1330.

Thus, in the case sub judice, because "contracting officers are vested with wide discretion with regard to the evaluation of bids," Labat-Anderson, Inc. v. United States, 42 Fed. Cl. 806, 846 (1999), and are also entitled to "broad discretion . . . to determine whether a proposal is technically acceptable," Cont'l Bus. Enters. v. United States, 452 F.2d 1016, 1021 (Ct. Cl. 1971), "plaintiff has an unusually heavy burden of proof in showing that the determination . . . was arbitrary and capricious." Id. For the reasons set forth below, plaintiff has failed to meet its burden.

**1. The NNSA's Decision to Add 0.8 FTE to Plaintiff's Probable Cost for an SME Consultant Was Rationally Based.**

Plaintiff's first challenge is to the NNSA's decision to add 0.8 FTE to plaintiff's proposal for an SME consultant for the Security Classification Administrative Support SOW. Pl.'s Mot. 19-20. According to plaintiff, the NNSA lacked a rational basis to increase plaintiff's proposed workforce because the task cited by the agency was not explicitly mentioned in the SOW. Id. Specifically, plaintiff contends that the SOW did not require a consultant to assist in self-assessments. Id. at 20. Because plaintiff proposed [ ] as a part-time SME consultant, plaintiff states that "it is reasonable to assume that he would be available for additional assignments should NNSA desire to add such work." Id. Further, plaintiff maintains that the awardee PAI was given credit for providing access to additional SMEs even though no SMEs were included in PAI's cost proposal and no probable cost adjustment was made to PAI's proposal. Id. Lastly, plaintiff argues that the NNSA, without a rational basis, "ma[d]e that additional .8 FTE a highly paid consultant." Id. at 21. Thus, plaintiff contends, had the NNSA used a reasonable rate for the additional proposed costs in this category, plaintiff's proposal would have been

approximately [ ] lower than that of the next highest offeror, and plaintiff's proposal would have presented the best value to the government. Id.

The SOW for Security Classification Administrative Support required:

> The Contractor shall provide Q-cleared personnel to research, develop, draft and prepare local classification guides per year as required by NSO programmatic offices. Using data supplied by the NSO Classification Officer, they will prepare the quarterly NSO classification report to HQ. This report will encompass classification guidance provided for NSO operations, education and training statistics, document review and declassification statistics, local guide status and NSO pending classification issues.

AR 68.

For Security Classification Administrative Support, plaintiff proposed 1.2 FTEs. Id. at 1623. The proposal included a Classification Support person (1.0 FTE) to perform various functions, including researching and locating documents, gathering data and performing statistical analyses, and "assist[ing] in the activities associated with program self-assessments." Id. Westech also proposed a part-time SME consultant (0.2 FTE), [ ], id. at 1683, to "review, maintain, and ensure accuracy of local classification guides issued by the NSO Classification Program Manager" and to "assist in and respond to findings associated with program self-assessments and Security Surveys," id. at 1623.

Plaintiff's argument fails because it ignores several aspects of the SOW and the Solicitation. First, the Solicitation stated that each offeror's cost proposal would be evaluated to determine cost realism. AR 66 (stating that the cost proposal would be evaluated to determine "if the proposed costs are realistic for the work to be performed, reflect a clear understanding of the SOW requirements, and are consistent with the various elements of the offeror's Technical Proposal"). The NNSA's November 2, 2006 discussion letter required plaintiff to "substantiate, in accordance with [its] technical approach, . . . any deviations from [its] staffing summary" against the government estimate of FTEs provided in the discussion letter. Id. at 1601 (noting that offerors in the competitive range were invited to revise their technical approach as necessary). Thus, plaintiff was aware that its cost proposal could be adjusted if the proposal was not realistic, did not meet the SOW requirements, or was inconsistent with its technical proposal.

Further, plaintiff's proposal stated that the SME consultant and the Classification Support person would be involved with program self-assessments. Id. at 1623. As noted above, the Solicitation required the NNSA to evaluate the offeror's technical approach, including the offeror's ability to identify and mitigate risks. Id. at 55; see also id. at 65 (noting that the offeror's technical approach should demonstrate "a thorough understanding of any technical risks and their impact associated with performance of the contract, as well as the Offeror's approach for minimizing those risks"). Westech's proposal identified the following technical risks:

> The Nevada Site Office (NSO) Classification Office must have experienced contractor support staff and local classification guides and orders that meet NSO requirements. If staff and guidelines do not conform to DOE orders[,] the risks include not meeting support schedules, and incomplete or inaccurate local guidance[.] This could result in the compromise of classified information with subsequent damage to national security.

Id. at 1634. Accordingly, plaintiff proposed that such risks could be reduced by "using qualified personnel to manage, conduct, and support the classification program; . . . and conducting routine self-assessments and review of other contractor's classification program activities." Id. at 1635. Westech sought to minimize this risk, in part, by relying upon [ ]. Id. (emphasizing its candidate's exceptional qualifications).

The NNSA's evaluation of Westech's technical approach determined that while Westech's proposed 0.2 FTE for an SME to assist in and respond to findings associated with program self-assessments and security surveys "may be appropriate for routine classification guide updates, this amount of coverage will not be sufficient to resolve findings that result from the self-assessments or surveys." Id. at 1871. Specifically, the NNSA found 0.2 FTE to be insufficient because "[a]ny findings require an involved response to resolve the findings," and "[t]he SME would be required to assist in this response." Id. at 1959. Thus, the NNSA added 0.8 FTE for this category to plaintiff's proposal "to ensure adequate coverage." Id. The NNSA, not the court, is in the best position to determine the staffing needs of its agency. A dispute of this nature is a classic example of the type of technical requirements that should be determined by the agency seeking outside personnel to assist in the fulfillment of the agency's mission. The NNSA provided a coherent reason justifying its finding that plaintiff failed to include sufficient personnel.

Finally, plaintiff contends that, assuming the NNSA's decision to add 0.8 FTE for Security Classification Administrative Support was reasonable, then the NNSA's decision to use plaintiff's labor rate for [ ] was unreasonable. Pl.'s Mot. 21; Pl.'s Reply & Resp. 8-9 (arguing that NNSA should have used an administrative rate of [ ] per hour for the additional 0.8 FTE rather than [ ] rate); see also Pl.'s Mot. 18 n.1 (stating that [ ] rate was [ ] per hour); AR 1685-86 (same). However, plaintiff's proposal stated that to mitigate risks, plaintiff offered "experienced and knowledgeable personnel." AR 1635. Plaintiff emphasized that "[p]roof resides in our proposed SME contributor, [ ]" because he has "30+ years experience" with NTS contractors. Id. Thus, the terms set forth in plaintiff's proposal defeat its position, and the NNSA's decision to utilize a labor rate for one of its key experts, [ ], to calculate the additional 0.8 FTE, id. at 1959, was rational.[27]

[27] In its Motion, plaintiff contends that PAI "was given credit for providing access to additional SMEs although they were not included in PAI's cost proposal and no probable cost adjustment was made to PAI's proposal." Pl.'s Mot. 20. However, a review of PAI's proposal reveals that, unlike that of plaintiff, [ ]. AR 165-67, 594-95. Thus, PAI's probable cost was not adjusted for this reason.

**2. The NNSA's Decision to Convert an Administrative Position to an SME in the VA Area Was Rationally Based.**

Plaintiff next argues that the NNSA's decision to require 3.0 FTE SMEs for VA tasks lacked a rational basis. Pl.'s Mot. 22-23. In plaintiff's view, the NNSA's downgrading of plaintiff's proposal for this perceived deficiency was unreasonable, and the NNSA further "compounded its error by increasing Westech's cost by [ ] to convert an administrative person to [an] SME." Id. at 23. According to plaintiff, because the NNSA determined that plaintiff's initial staffing proposal was adequate, the agency should not have increased VA staffing, which consequently raised Westech's costs for the VA component of its offer. Id. Plaintiff argues that had defendant not made this change, its offer would have been [ ] lower than the next highest offer; and, thus, would have represented the best value to the government. Id.

Specifically, the SOW for the VA task requires that:

> VAs shall be performed by the Contractor's Q-cleared, Subject Matter Experts in the areas of vulnerability analysis and facility modeling. The Contractor shall perform, conduct and prepare the reports of facility modeling and VAs; conduct Table-top analyses and prepare reports of those activities; and develop force-on-force plans and scenarios for protective force operations at key NSO facilities. In addition, the Contractor shall identify critical system components to be performance tested.

AR 67. As noted above, the government estimated a need for 3.0 FTEs to perform the VA task. Id. at 1601. The NNSA asked each offeror to "substantiate, in accordance with [the offeror's] technical approach (Criterion 2 - Technical Capability, paragraph (i)), any deviations from [its] staffing summary against the above estimate." Id.

In response to the November 2, 2006 discussion letter, plaintiff's final proposal offered a team of 3.0 FTEs for the VA task,[28] consisting of "a team lead who is a Subject Matter Expert (SME) in the VA process, . . . and an analyst . . . . In addition, [plaintiff] proposed an administrative support person . . . to provide documentation support . . . ." Id. at 1620; see also

---

[28] Plaintiff argues that when it initially proposed 2.5 FTEs for VA staffing, consisting of a Senior VA Consultant II (an SME), Security Specialist (an SME), and Administrative Security Specialist, the NNSA found such staffing adequate in August 2006. Pl.'s Mot. 22-23 (citing AR 2498). Thus, plaintiff asserts that the NNSA found two SMEs to be sufficient, but then, without explanation, the NNSA found this "arrangement [to be] deficient." Id. To support its proposition, plaintiff cites to a "Quantitative Evaluation Checklist" that was used to determine which offerors would be selected for the competitive range. AR 2498-2500. The competitive range was established to conduct discussions with offerors. Id. at 2515. Because plaintiff was included in the competitive range, the evaluation checklist and decisions in the evaluation are not relevant to determining whether the NNSA's decision to require 3.0 FTE SMEs is rational.

Pl.'s Mot. 22 (noting that plaintiff's final staffing proposal for the VA task consisted of 2.0 FTE SMEs and 1.0 FTE who was an administrative support person).

The SOW for the VA task specifically stated that SMEs were required to perform this task. AR 67. Plaintiff was allowed the opportunity, through discussions, to explain how it would accomplish this task. Id. at 1267 (noting, in the first discussion letter to Westech, how "Westech's approach explained [its] understanding of the VA process, however, Westech's approach did not clearly elaborate as to how [it] would accomplish this SOW element"). Consequently, the SEB's Report found that plaintiff's "proposed labor mix in its staffing plan [was] not adequate for accomplishing this SOW element." Id. at 1944. Specifically, the SEB noted that plaintiff relied on "Federal SME support to augment the performance of this SOW element without explaining how this proposed approach would not compromise the role of the Federal personnel providing independent oversight of the contractor." Id. In its final proposal, Westech stated that the SMEs would be drawn from the Federal workforce or other contractors working at the site. Id. at 1621. Westech's final proposal offered two SMEs supported by an administrative support person, which the NNSA found to be "not adequate for performing this SOW element because SOW requires SMEs to accomplish VAs and the VA Administrative Support is not considered [an] SME." Id. at 1958. Consequently, even though plaintiff was provided the opportunity to explain its decision to depart from the agency's staffing estimate, it failed to do so. Thus, the NNSA provided a rational basis for its decision to adjust Westech's proposal, and accordingly its probable cost, by replacing the administrative position with an SME (1.0 FTE), at a labor rate reached by averaging the rates of the senior VA consultant and the security analyst. Id.

Plaintiff additionally argues that it would be "inefficient and unnecessarily expensive" to have an SME perform administrative functions, such as "gathering data, preparing reports, and coordinating/distributing reports for approval by DOE/NNSA." Pl.'s Reply & Resp. 10. Contrary to plaintiff's view, the SOW clearly states that the VA task shall be performed by SMEs in the areas of vulnerability analysis and facility modeling, and the remainder of the SOW description appears to correspond to tasks associated with vulnerability analysis and facility modeling. AR 67. It is well established that an agency's decision, especially regarding a technical evaluation, is afforded great weight. Omega World Travel, 54 Fed. Cl. at 578. Thus, the court affords the appropriate deference to the NNSA's decision to require SMEs to perform the VA task and finds that the NNSA's decision was in accordance with the law.

Lastly, plaintiff asserts that during discussions, the NNSA was required to advise Westech about deficiencies in Westech's proposal. Pl.'s Mot. 23; Pl.'s Reply & Resp. 10. Specifically, plaintiff contends that the NNSA erred by failing to notify Westech in the November 2, 2006 discussion letter that only SMEs would be accepted for the VA task. Pl.'s Mot. 23; Pl.'s Reply & Resp. 10. However, plaintiff's argument ignores the requirements set

forth in the Solicitation. The SOW for the VA task clearly stated that only subject matter experts can perform VAs.[29] AR 67.

Both the regulations and case law dictate what "discussions" between an agency and an offeror should include.[30] During discussions, the contracting officer is not obligated to identify each and every item that might improve an offeror's proposal. Dynacs Eng'g Co. v. United States, 48 Fed. Cl. 124, 131 (2000); Cube Corp. v. United States, 46 Fed. Cl. 368, 384 (2000); ACRA, Inc. v. United States, 44 Fed. Cl. 288, 295-96 (1999); Labat-Anderson, 42 Fed. Cl. at 835 ("[A]gencies are not obligated to conduct all-encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal."). To require otherwise would saddle an onerous obligation on the contracting agency; namely, to shift the task of proposal writing from the private contractor to the government agency. Nevertheless, at a minimum, the contracting officer must "indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." 48 C.F.R. § 15.306(d)(3); see also Bionetics Corp., No. B-280521, 1998 WL 951702, at *3 (Comp. Gen. Oct. 14, 1998)[31] (stating that offerors in the competitive range should be notified of weaknesses so they "have a reasonable opportunity to address those areas of weakness which could have a competitive impact").

As noted above, the SOW for the VA task clearly required SMEs. AR 67 (stating that "VAs shall be performed by the Contractor's Q-cleared, Subject Matter Experts"). After Westech's July 7, 2005 initial proposal in which Westech offered 2.5 FTEs comprised of two SMEs, Westech had two opportunities after the competitive range was established to revise its proposal to include only SMEs for the VA task. See id. at 1272-1598 (Westech's October 6, 2006 Revised Proposal), 1615-1796 (Westech's November 9, 2006 Final Proposal). The NNSA's decision not to inform Westech in its November 2, 2006 discussion letter that proposals

---

[29] Further, defendant argues that the SME requirement was clear because PAI, [ ], did not misunderstand the requirement. Def.'s Cross-Mot. 16 n.5. Defendant also asserts that neither PSI nor Santa Fe misunderstood the requirement "due to the fact that their probable costs were not increased." Id. Based on the Report, Santa Fe's final proposed cost was [ ], and PSI's final proposed cost was [ ]. AR 1910. The administrative record does not contain the proposals submitted by PSI or Santa Fe and contains only brief evaluations of their proposals. See, e.g., id. at 1910-11; 1961-71; 1983-90. Thus, based on the administrative record alone, the court cannot discern how many SMEs Santa Fe or PSI proposed. However, it appears that both Santa Fe and PSI, at least, [ ]. Id. at 1965, 1971.

[30] "When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions." 48 C.F.R. § 15.306(d).

[31] See infra note 38 (noting that while decisions of the General Accountability Office ("GAO") are not binding on the Court of Federal Claims, the court finds GAO decisions informative).

should include only SMEs was rational because the language of the SOW clearly required SMEs and Westech had opportunities to correct its proposal. Thus, the court finds that the NNSA did not commit error.

### 3. The NNSA's Decision to Add 1.7 FTEs to Plaintiff's Probable Cost Was Rationally Based.

Next, plaintiff contends that the NNSA, without rational basis, increased Westech's proposal by approximately 1.7 FTEs (15,342 labor hours over the length of the contract), representing 0.5 FTE per year for Classified Matter Staffing and Administrative Support, 0.2 FTE for two of the three base years and both option years for IT/Website Support, and 1.0 FTE per year for Security Education/S&S Professional Training. Pl.'s Mot. 24-25. Plaintiff argues that the NNSA "repeatedly advised offerors that they should come up with their best estimates for staffing." Id. at 24 (referring to questions and answers posted by the DOE's Industry Interactive Procurement System, AR 2398, 2408, 2415, 2479). However, plaintiff asserts that the NNSA "treated the Government Estimate as a requirement akin to having identified a required number of labor hours in the Solicitation . . . [though t]he Solicitation . . . did not specify the required hours." Id. at 25. The NNSA's increase of Westech's FTEs, plaintiff maintains, resulted in "an unreasonable increase of $571,012 in Westech's probable cost [and] prejudiced Westech." Id.

The NNSA's November 2, 2006 discussion letter provided staffing estimates and asked offerors to explain any deviations from the estimate. AR 1601. Plaintiff's proposal provided for approximately 6.2 FTEs for the four areas of OPSEC (3.9 FTEs), id. at 1621; Security Classification Administrative Support (1.2 FTEs),[32] id. at 1623; Classified Matter Staffing and Administrative Support (1.0 FTE), id.; and Other Security Support (0.3 FTE for the first base year; 0.1 FTE thereafter), id. at 1624. Thus, the NNSA required Westech to "substantiate any deviations" from the 9.0 FTEs estimated by the government for these four tasks. Id. at 1601. Plaintiff argues that based on the requirements of these tasks, its proposed staffing was adequate because of its company practice of cross-training its employees to cover multiple tasks and its track record of success in using this technique during the performance of other contracts. Pl.'s Mot. 25.

The administrative record reflects that plaintiff's practice of cross-training employees was not lost on the NNSA. Indeed, the NNSA determined that Westech's approach to cross-training personnel was "considered to be a strength." AR 1948. In its Report, the SEB noted that:

> [Westech] identified over 40 highly skilled available professionals proposed to contribute to the contract. Westech proposes to cross-train OPSEC personnel to be

[32] The court has already found that the NNSA's addition of 0.8 FTE to plaintiff's proposed 1.2 FTEs for the Security Classification Administrative Support SOW, and the NNSA's resulting increase of plaintiff's probable cost for this area, was rational. See supra section IV.A.1.

> classified matter custodians and provide security awareness training. Additionally, the proposal describes Westech's system of personnel management and benchmarks of success. These strategies should effectively enable Westech to provide a highly trained nucleus of employees to meet the SOW.

Id. While the NNSA regarded Westech's approach to cross-training employees a "Strength" for Westech's ability to "provide a highly trained nucleus of employees," id. at 1947-48, the NNSA gave Westech a "Significant Weakness" rating for its technical approach because these highly skilled employees would be unable to adequately perform all tasks. See id. at 1944; see also id. at 1957 ("While [Westech] emphasizes cross-training, the SEB finds that to be effective, additional FTEs are required for adequate coverage. During discussions, offerors were asked to substantiate any deviations from the government's staffing summary which was disclosed to them. Westech did not adequately substantiate its lower proposed staffing."). Thus, the NNSA found it necessary to increase Westech's proposal by 2.5 FTEs during its cost realism analysis because the proposed FTEs were insufficient to provide adequate coverage for the SOW elements.[33] Id. at 1956-59. If, as plaintiff suggests, the NNSA had used the government estimate as a requirement, then the NNSA simply could have added 2.8 FTEs to Westech's proposed staffing estimate. Rather than being concerned with a specific numerical requirement, as plaintiff claims, it is clear that the NNSA was concerned that the "shortfall in FTEs could result in assignments to individuals [who] have significant responsibilities and could adversely affect performance of these SOW elements." Id. at 1947. Accordingly, as more fully explained below, the court finds that the NNSA possessed a rational basis for increasing Westech's proposed staffing to satisfy the SOW requirements.

**a. OPSEC**

Plaintiff does not challenge this element because the NNSA made no adjustments to Westech's probable cost in this area. However, the court describes the OPSEC functions listed in the Solicitation because the NNSA stated that the approach to four tasks (OPSEC, Security Classification Administrative Support, Classified Matter Staffing and Administrative Support, and Other Security Support) could be integrated. Id. at 1601, 1982. Thus, comprehension of the duties required under the OPSEC element is critical to understanding the NNSA's reasoning for adding FTEs to Westech's estimate. As explained below, the NNSA made adjustments to Westech's staffing proposal because the NNSA found that Westech understaffed these four SOW elements, which could require the proposed FTEs to undertake too many responsibilities and "could adversely affect performance of these SOW elements." Id. at 1982.

---

[33] The 2.5 FTEs were comprised of: (1) 0.8 FTE for Security Classification Administrative Support discussed earlier; (2) 1.0 FTE for Security Education/S&S Performance Training under the Other Security Support element; (3) 0.5 FTE for Classified Matter Staffing and Administrative Support; and (4) 0.2 FTE for four of the five contract years for IT/Website Support under the Other Security Support element. AR 1956-59.

The Solicitation required that the successful offeror perform the following functions for the OPSEC task:

> a. The Contractor shall provide all OPSEC functions for the NNSA/NSO, perform OPSEC assessments and other assigned OPSEC functions of various NNSA/NSO or other Department of Energy (DOE) or NNSA facilities or operations. The Contractor shall prepare and distribute reports of those activities. OPSEC assessments shall be performed by Q-cleared, Subject Matter Experts in the area of OPSEC. The Contractor shall also:
>
> 1. Provide OPSEC support for NSO operations, DOE, and NNSA HQ OPSEC program requirements throughout the DOE/NNSA complex.
>
> 2. Provide Operations Security vulnerability planning and conduct Vulnerability Assessments, as required, to develop site-specific threat statements in accordance with applicable requirements.
>
> 3. Assist in the research and validation necessary to modify and publish such documents as the NSO OPSEC Strategic Plan, OPSEC Statements of Threat (classified and unclassified), OPSEC Assessment Procedural Guide, OPSEC Employee Guide, annual OPSEC Program Activities report to HQ DOE, and other non-recurring education and awareness publications.
>
> 4. Conduct OPSEC assessments, reviews, and support Nuclear Emergency Support Team (NEST) deployments; administer the OPSEC Program for all NSO Management and Operating (M&O) Contractor locations; develop and promulgate required plans, annexes, and implementation guidance; develop and assist in implementing cost-effective countermeasures and educate employees on sound OPSEC practices; develop and disseminate periodic, credible cross-feed information on new or anecdotal events to enhance program credibility.

Id. at 67-68.

The SEB's Report made no probable cost adjustments to Westech's proposed 3.9 FTEs for OPSEC personnel. Id. at 1959. The 3.9 FTEs consisted of "1 key person" and "three other OPSEC Security Specialist-Administrative Assistants," and the NNSA determined that the "1 key person" Westech proposed could "effectively lead the OPSEC program at the NTS." Id.

**b. Classified Matter Staffing and Administrative Support**

Plaintiff challenges the NNSA's decision to raise Westech's proposed costs by adding 0.5 FTE for a Classified Matter Staffing and Administrative Support position. Pl.'s Mot. 24-25.

Because the NNSA stated that the four SOW areas could be integrated, plaintiff argues that its proposed 1.0 FTE was sufficient to perform this SOW. Pl.'s Reply & Resp. 15.

The Classified Matter Staffing and Administrative Support SOW required that:

> The Contractor shall provide Q-cleared personnel to staff and maintain the Classified Matter Control Center (CMCC) vault-type room. They will provide staff assistance and administration oversight of all classified matter custodians in M&O contractor facilities; maintain an accurate database of the classified documents and materials stored within the CMCC; and operate the CMCC as the designated classified mailing center for all NSO M&O contractor addresses.
>
> The contractor shall also provide Classified Matter Protection and Control (CMPC) Custodian training for all NNSA/NSO federal and contractor employees for all classified matter custodians.

AR 69. Westech proposed 1.0 FTE for an administrative assistant to perform the tasks associated with this SOW.[34] Id. at 1623. Plaintiff's proposal provided that this individual would serve "as the primary support to the CMCC, and as such can devote full time (1.0 FTE) to the CMCC duties and responsibilities." Id. In addition, Westech explained that one of the OPSEC Security Specialists would serve as "backup" to the Classified Matter Control Center staff, as needed. Id.

The NNSA considered this portion of plaintiff's proposal insufficient because although plaintiff's administrative assistant would perform the majority of the duties for this element, plaintiff also "proposed to have one of its OPSEC Security Specialists act as back-up to staff the CMCC and provide CMPC training." Id. at 1959. The NNSA stated that this SOW required the contractor staff to operate the Classified Matter Control Center as well as other elements of "Classified Matter Staffing and Administrative Support (i.e. CMPC training and providing oversight of all classified matter custodians in M&O facilities)." Id. at 1978. Thus, while the Classified Matter Control Center was operated by appointment, the NNSA was concerned that "the availability of [Westech's] OPSEC personnel to staff and maintain the CMCC may be limited because of travel and other OPSEC commitments." Id. Westech's approach was deemed a risk because the "proposed OPSEC Security Specialist has numerous responsibilities which could adversely affect performance." Id. at 1959. As a result, the NNSA added 0.5 FTE for the administrative assistant labor category "to ensure adequate coverage of all requirements of this SOW element." Id. In light of the responsibilities required by the OPSEC task, the NNSA's decision to add 0.5 FTE for a Classified Matter Staffing and Administrative Support position to ensure sufficient coverage was rational.

[34] Westech initially proposed 0.5 FTE, but in its Final Revised Proposal, offered 1.0 FTE to perform this SOW "to allow complete access to classified matter on an 8 hours/day, 5 days/week basis." AR 1623.

Westech additionally argues that its staffing approach was fully supported by its excellent past performance, which, it argues, the NNSA failed to adequately consider. Pl.'s Reply & Resp. 16-17. In its proposal, Westech specifically referenced its contract performance at the Pantex Site Office of the DOE/NNSA ("PSO contract"), and noted that its experience "indicated that one full time custodian was sufficient to provide access to classified matter in a timely manner." AR 1623; see also id. at 858-59 (stating the description of work for the PSO contract and documenting Westech's performance on the contract). Plaintiff argues that nothing in the administrative record indicates that the NNSA considered Westech's performance of the PSO contract as evidence of Westech's successful approach to cross-training. Pl.'s Reply & Resp. 16-17.

When the court considers a bid protest challenge to the past performance evaluation conducted by the agency, "the greatest deference possible is given to the agency." Gulf Group Inc. v. United States, 61 Fed. Cl. 338, 351 (2004); see also Overstreet Elec. Co. v. United States, 59 Fed. Cl. 99, 117 (2003) (stating that "when a procurement involves performance standards . . . a court must grant even more deference to the evaluator's decision[,] . . . a triple whammy of deference"). However, "past performance evaluations are subject to the same APA review as other agency actions challenged in this court on a bid protest." CSE Constr. Co. v. United States, 58 Fed. Cl. 230, 252 (2003); see also Seattle Sec. Servs., 45 Fed. Cl. at 567 (noting that "the exercise of [an agency's] discretion obviously must be reasonable"). Thus, this court's review of an agency's "evaluations of an offeror's . . . past performance . . . should be limited to determining whether the evaluation was reasonable, consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements." JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 659 (2002); see also Consol. Eng'g Servs. v. United States, 64 Fed. Cl. 617, 637 (2005) (stating that the evaluation of past performance is "within the discretion of the contracting agency and will not be disturbed unless it is unreasonable or inconsistent with the terms of the solicitation or applicable statutes or regulations").

In its Report, the SEB explained how it used the Past Performance criterion to evaluate each offeror's proposal. See AR 1950-55. According to the Report:

> The past performance information evaluated included assessments of performance prepared by Federal officials; Award Fee Determinations; Self Assessments; Past Performance Questionnaires; and individual reference checks. Follow up information was requested from Offerors' references that had not submitted a questionnaire.

Id. at 1951. The focus of the SEB, in evaluating past performance, was to determine the "prospects for successfully performing the SOW." Id. In applying the above standard to Westech's past performance, the NNSA utilized a "table [to] summarize[] the SEB's analysis of the individual contracts provided by the Westech team." Id. This table included items such as the contract number, the period of performance, the relevance of the past contract to the SOW in the instant Solicitation, the description of past contract work, the former customer's rating, and

the NNSA's rating, which weighed the relevance of the past contract and the customer's rating. Id. at 1952-55. The NNSA noted that the PSO contract was relevant to the SOW, and stated that the description of work for the PSO contract included "[t]raining development [and] processing of classified documents and reports." Id. at 1952. Based on its evaluation, the NNSA gave Westech's past performance on the PSO contract a rating of "Significant Strength."[35] Id.

As noted above, this court's review of the NNSA's evaluation of Westech's past performance is limited to determining whether the evaluation was reasonable and consistent with the evaluation criteria. JWK Int'l Corp., 52 Fed. Cl. at 659. Plaintiff asserts that the administrative record does not reflect that the NNSA considered Westech's past performance on the PSO contract as it relates to cross-training. While the SEB's Report does not provide an exhaustive comparison of Westech's past performance and its relevance to the SOW for this contract, that level of detail is not required. Here, the NNSA's reasoning is sufficient for this court to determine that the agency clearly did weigh Westech's past performance, and specifically, did consider the PSO contract. The agency need not perform a comprehensive analysis of an offeror's entire contracting history. Further, the NNSA's reasoning is sufficient for the court to determine that the NNSA's evaluation of Westech's past performance was reasonable and consistent with the stated criteria. Accordingly, the court will not disturb the NNSA's rationally based evaluation.

**c. IT/Website Support**

Plaintiff challenges the NNSA's decision to add 0.2 FTE to Westech's proposal for four contract years in the IT/Website Support category. Pl.'s Mot. 24-25; Pl.'s Reply & Resp. 17-18. For IT/Website Support tasks, the Solicitation stated:

> The Contractor shall develop, publish and maintain an Intranet Web Site that provides a comprehensive set of security policies and procedures for M&O contractor employees. This web site shall be maintained to ensure that it contains the current approved record copy of M&O contractor security procedures. This web site shall be accessible from all M&O contractor work locations where NSO Intranet access is available.

AR 69-70.

For the first year of performance, Westech proposed 0.2 FTE for a Website Designer. Id. at 1624. However, for the remaining contract years, Westech proposed that maintenance and updates to the "web-based publication [would] be performed by cross-trained administrative staff performing other functions." Id. Westech argues that the NNSA incorrectly read Westech's

---

[35] "[T]he SEB . . . evaluated and assessed the quality of the past performance of the relevant contracts from the information provided by customer ratings. A significant strength was assigned to contracts rated by customers as Outstanding or Excellent." AR 1951.

approach to this task by assuming that updates would be performed by other contractors. Pl.'s Reply & Resp. 17-18. Westech's proposal offered:

> Based on past experience at other DOE facilities, WESTECH proposes 0.2 FTE in the Basic-First Year for the purposes of identifying Intranet Web Site requirements, and implementing (i.e., developing the HTML) web-based publication of security policies and procedures for the M&O contractor. We will work closely with either the M&O or the NSO Information Technology (IT) resources . . . to develop the web-based publication. Maintenance and updates . . . will be performed by cross-trained administrative staff performing other functions . . . . WESTECH successfully employed this strategy at other DOE facilities, and by utilizing the M&O resources, WESTECH did not incur any IT expenses for DOE.

AR 1624.

The NNSA found that for this SOW, the SEB could not "ascertain any additional benefit to NSO with regard to Westech's approach." Id. at 1947. The NNSA noted that the SOW required "continued maintenance of the Intranet Website." Id. at 1959. Accordingly, the NNSA interpreted Westech's proposal as relying on government employees. Id. at 1947. Specifically, the NNSA was concerned that "after using Westech's IT resources at the beginning of contract performance for developing the intranet website, Westech propose[d] to use the M&O IT resources that are currently available and in place at NSO to maintain the Intranet Web Site services rather than using Westech's resources." Id. The NNSA determined that Westech's approach was a risk to performance, id. at 1959, because "[t]hese M&O IT resources may not be qualified in security policies or procedures or available and no alternative approach was proposed by Westech." Id. at 1947. The NNSA's reading of Westech's proposal was reasonable because the document states that plaintiff intended to utilize the M&O resources. Id. at 1624. Thus, the NNSA reasoned that the increase of 0.2 FTE for the four remaining contract years was necessary for the "Web Designer category to ensure adequate coverage throughout the contract performance for website maintenance." Id. at 1959. In light of the reasoning provided, the court finds that the NNSA's addition to Westech's cost realism analysis was rationally based.

**d. Security Education/S&S Professional Training**

Finally, plaintiff challenges the NNSA's decision to add 1.0 FTE to plaintiff's proposal for the Security Education/S&S Professional Training tasks. Pl.'s Mot. 24-25. To determine whether the NNSA's decision was reasonable, the court turns to the pertinent provision of the Solicitation:

> The Contractor shall be responsible for providing security briefings to federal and contractor employees, including initial, annual, termination and special briefings. Contractor personnel shall prepare security education and awareness media to serve

> NNSA employees at locations throughout Las Vegas, the NTS, and at other NSO locations outside of Nevada.
>
> The Contractor shall maintain and update security education and training records to ensure briefings are recorded on each employees "Individual Training History Report."
>
> Perform Safeguards Security Professional Training Program for NNSA/NSO and its contractors except for Protective Force personnel.

AR 70.

Westech's final proposal offered approximately 0.1 FTE for these duties, explaining that "[o]ne of the Security Specialists, who provides Classified Matter Protection and Control (CMPC) certification training and comprehensive security briefings, will also act as the Security Education/Safeguards and Security (S&S) Professional Training Program Coordinator, and act as backup to the Classified Matter Control Center (CMCC) personnel, as needed." Id. at 1621; see also id. at 1624 (stating that one of the proposed OPSEC Specialists would also serve in this role for the "Other Security Support" element); id. at 1623 (stating in its proposal that one of the OPSEC Security Specialists "will act as backup to the primary CMCC staff," as needed). Further, in the OPSEC task area of its proposal, Westech explained that it had increased staffing by 1.0 FTE because of the "increased workload associated with providing security awareness training for the entire NSO workforce," id. at 1622; thus, in Westech's view, because the four SOW areas could be integrated, this description addressed the Other Security Support requirements and "how the security training would be staffed." Pl.'s Mot. 14. In essence, plaintiff argues that increased OPSEC staffing provided sufficient personnel to accomplish the tasks of Security Education/S&S Professional Training. Accordingly, plaintiff contends that because the NNSA failed to understand Westech's approach, the NNSA unreasonably increased Westech's cost proposal to cure perceived insufficient staffing. Pl.'s Reply & Resp. 14-15.

While Westech argues that an offeror could propose an integrated approach to the four elements, Westech's approach clearly was not integrated. Instead, plaintiff's proposal identified the four areas separately, with proposed staffing assigned to each area. Undoubtedly, an offeror carries the burden of presenting "an adequately written proposal, and an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably." United Enter. & Assocs. v. United States, 70 Fed. Cl. 1, 26 (2006) (citation & quotations omitted). Plaintiff now cannot argue that the NNSA misread its "integrated" approach when plaintiff's proposal does not reflect such an approach; thus, plaintiff's argument fails.

Further, under Westech's proposal, an OPSEC Security Specialist would spend one-tenth of its time performing functions such as conducting security briefings, updating security education and training records, and running the S&S Professional Training program as required

by the SOW. AR 70. However, the NNSA determined that "Other Security Support requires numerous responsibilities relative to training which will not be adequately covered with 0.1 FTE, especially since this function will be performed by an OPSEC specialist who is primarily responsible for OPSEC duties," as described above.[36] Id. at 1959 (noting that to ensure "adequate coverage of security briefings, security education and training records and Safeguards Security Professional Training," 1.0 FTE should be added). Additionally, Westech's proposal required one of the Security Specialists who was to provide Classified Matter Protection and Control training and security briefings also to act as backup to the Classified Matter Control Center personnel. Id. at 1621. However, Westech failed to explain how 0.1 FTE was sufficient to perform the tasks required by the SOW, necessitating the NNSA's decision to increase staffing by 1.0 FTE. Id. at 1957 (stating that Westech "did not adequately substantiate its lower proposed staffing"). As noted above, the agency's decision is afforded deference regarding its evaluation of technical proposals. In light of the SOW for these four areas and the NNSA's reasoning, the court finds that the NNSA's decision was rational.

### 4. The NNSA's Decision to Increase Plaintiff's Probable Cost by Applying a Three Percent Escalation Rate to Westech's Service Contract Act Positions Was Rationally Based.

Plaintiff next asserts that the NNSA arbitrarily increased its probable cost by [ ] by applying a three percent escalation rate to labor categories affected by the Service Contract Act. Pl.'s Mot. 26. Despite its claim of agency error, Westech admits that because its proposal was for a "cost type contract, it would probably have been prudent to include some reasonable escalation to reflect anticipated increases in the Wage Determination." Id. Thus, plaintiff does not challenge the NNSA's use of escalation but rather, challenges the NNSA's three percent rate, arguing that this determination was not discussed with plaintiff, and further that the rate lacks a rational basis "in light of the historical low increase in Wage Determinations." Id. Additionally, plaintiff argues that the NNSA ignored the fact that the agency "could have held Westech to its representation and refused to reimburse increases for [Service Contract Act] positions unless the increases were mandated by a new Wage Determination." Pl.'s Reply & Resp. 20. In essence, plaintiff argues that the NNSA acted irrationally by refusing to take advantage of plaintiff's failure to properly include a labor escalation rate.

---

[36] Plaintiff additionally argues that the NNSA essentially treated the government estimate as a minimum requirement. Pl.'s Mot. 25. However, while the government estimate for these four areas was 9.0 FTEs and plaintiff proposed approximately 6.2 FTEs, the NNSA only increased plaintiff's proposal by 2.5 FTEs. Thus, the NNSA only raised plaintiff's total FTEs to 8.7–0.3 FTE below the government estimate of 9.0 FTEs. Thus, plaintiff's argument that the NNSA treated the estimate as a minimum requirement is unconvincing. Indeed, contrary to plaintiff's view that defendant imposed an arbitrary minimum number of FTEs for the four areas, the NNSA compared Westech's proposed number of employees to the tasks to be carried out and determined that plaintiff's estimated number of employees fell short. The NNSA examined the responsibilities of each SOW, and based upon its familiarity with what was required to fulfill each task, determined that Westech's proposal was deficient.

To evaluate whether the NNSA's decision was rational, the court first turns to the terms of the Solicitation. The Solicitation required each offeror to set forth its compensation policies, including salaries, merit adjustments, recruitment programs, and fringe benefits, and to explain how its "compensation package will ensure the recruitment and retention of qualified personnel for this contract." AR 60. Further, the Solicitation required that "[i]n the performance of this contract, the contractor shall comply with the requirements of U.S. Department of Labor Wage Determination Number 1994-2331, dated 12/16/2004." Id. at 31. Westech's compensation plan stated that "[t]he base rates (except for those subject to Service Contract Act) are adjusted annually by an escalation factor of 3.0% starting January 1, 2008 of each WESTECH calendar year to account for merit increases that may occur per WESTECH's standard compensation policies." Id. at 1666; see also id. at 1667 ("WESTECH anticipates that this escalation will be vital in order to recruit and retain qualified personnel."). Westech's management determined that the three percent escalation rate was "reasonable," was to be applied "company-wide," and was "not anticipated to vary for the geographical area." Id. at 1667. However, because plaintiff anticipated that wages for Service Contract Act employees would "change by contract modification in the event of an updated wage determination being incorporated into the contract," plaintiff did not escalate the wages of Service Contract Act employees. Id.

Based on Westech's three percent escalation rate for non-Service Contract Act positions, the NNSA, as part of its cost realism analysis, applied the same three percent escalation rate for the Service Contract Act positions. Id. at 1956 ("As a result of its realism evaluation, the SEB added escalation to all wage determination categories at the same rate proposed by [Westech] for the remaining categories."). Westech's proposal noted that the "proposed escalation" was to be applied "company-wide," and was "not anticipated to vary for the geographical area." Id. at 1667. Thus, it is reasonable to this court that the NNSA applied the three percent escalation company-wide, to "recruit and retain qualified personnel" covered by the Service Contract Act.

**5. The NNSA's Decision to Increase Plaintiff's Probable Cost by Applying a Three Percent Escalation Rate to Subcontractor CAS's Service Contract Act Positions Was Rationally Based.**

Finally, plaintiff asserts that the NNSA improperly raised plaintiff's subcontract costs by [ ] by applying a three percent escalation rate to subcontractor labor covered by the Wage Determinations. Pl.'s Mot. 27. Plaintiff notes that the subcontractor, CAS, was committed to performing the contract at the proposed fixed hourly labor rates; thus, plaintiff argues that the NNSA erroneously applied the escalation to the Service Contract Act positions. Id. However, plaintiff asserts that if escalation was reasonable, then the three percent rate had no rational basis, because historically, there had been low increases in the Wage Determinations. Id. at 26-27.

Both subcontractors, Polestar and CAS, agreed to time-and-materials type contracts.[37] AR 1649-50, 1683. No probable cost adjustments were made to Polestar's proposal. Id. at 1957. However, the NNSA applied a three percent escalation rate to all years of CAS's proposal because, similar to Westech's proposal, CAS had not escalated the rate for the Service Contract Act positions. Id. at 1958. In its initial proposal, CAS stated that a three percent escalation rate per contract year would apply. Id. at 1183. However, in its final proposal, CAS stated:

> Labor escalation factors: 0.0% per contract year. The rates proposed in accordance with the Service Contract Wage Determination No. 2005-2332, Rev.1 are not escalated as they are anticipated to change by contract modification in the event of an updated wage determination being incorporated to the contract.

Id. at 1731. Similar to Westech's compensation policy, CAS's policy provided that "[m]erit reviews are performed for all employees on an annual merit cycle where employees receive an increase in pay based on: 1) a performance rating and 2) position within the salary ranges. Additional compensation can be realized through performance incentives." Id. at 1736. CAS's policy covered "all employees"; thus, the NNSA rationally applied the three percent escalation rate company-wide.

### B. The NNSA's Decision to Downgrade Plaintiff's Technical Rating and Increase Westech's Probable Cost Was Rationally Based.

Plaintiff asserts that the NNSA penalized Westech twice for the same deficiency by decreasing Westech's technical score and increasing Westech's probable cost by 2.5 FTEs. Pl.'s Mot. 28-31; Pl.'s Reply & Resp. 23-27. Specifically, plaintiff argues that because the costs added by the NNSA to Westech's technical proposal "mitigated most of the deficiencies identified by NNSA," Pl.'s Mot. 29, the NNSA's actions "prejudiced" plaintiff and served as a "double penalty." Id. at 31.

However, relying on Serco, Inc., No. B-298266, 2006 WL 2482978 (Comp. Gen. Aug. 9, 2006), defendant argues that the NNSA correctly reevaluated Westech's technical score after adjusting Westech's probable cost.[38] Def.'s Cross-Mot. 26-27. In Serco, the GAO found that

---

[37] "A time-and-materials contract provides for acquiring supplies or services on the basis of (1) direct labor hours at specified fixed hourly rates that include wages, overhead, general and administrative expenses, and profit and (2) materials at cost, including, if appropriate, material handling costs as part of material costs." 48 C.F.R. § 16.601(a).

[38] While GAO decisions are not binding on the Court of Federal Claims, Honeywell, 870 F.2d at 647, the court finds these decisions instructive. Tel-Instrument Elec. Corp. v. United States, 56 Fed. Cl. 174, 177 n.2 (2003) ("GAO decisions are not binding on this court, but we normally accord them deference in recognition of GAO's expertise in resolving contested procurement decisions."), aff'd, 87 Fed. App'x 752 (Fed. Cir. 2004); N.C. Div. of Servs. for the Blind v. United States, 53 Fed. Cl. 147, 166 n.13 (2002) (same). But see Data Mgmt. Servs.

upon making cost realism adjustments to an offeror's proposal, the Navy failed to reevaluate the offeror's technical proposal in light of the cost realism adjustment. 2006 WL 2482978, at *6. The solicitation in Serco required offerors to "'demonstrate that [they] fully underst[oo]d the specific and unique requirements of the efforts'" in their task responses. Id. (citation omitted). Then, the Navy would "'evaluate each offeror's depth of understanding and knowledge of the solicitation requirements and [the offeror's] demonstrated ability to perform tasks set forth in the Solicitation Statement of Work.'" Id. (citation omitted). Based on the solicitation's evaluation criteria, the GAO recommended that the Navy reevaluate the final revised proposal of the winning bidder to "adequately document whether the cost realism adjustments made by the Navy require revision to [the winning bidder's] technical evaluation ratings." Id.

Similarly, in the case sub judice, the Solicitation stated that "[t]he cost proposal would be evaluated to determine if the proposed costs are realistic for the work to be performed, reflect a clear understanding of the SOW requirements, and are consistent with the various elements of the offeror's Technical Proposal." AR 66. "Inconsistencies between the Cost Proposal and other portions of the proposal could raise concerns regarding the Offeror's understanding of the requirements and ability to perform the work for the proposed cost." Id. As such, an "unrealistic, unreasonable, or incomplete cost proposal may be evidence of the offeror's lack of or poor understanding of the requirements of the solicitation, and thus may adversely affect the offeror's rating on the Technical Proposal criteria." Id. The Solicitation made clear that a realistic cost proposal could be tied to the offeror's technical score. It is only logical that the NNSA made adjustments to Westech's proposed costs because the NNSA determined that aspects of Westech's cost proposal were unrealistic, did not reflect a clear understanding of the SOW requirements, and were inconsistent with Westech's technical proposal. For example, for the Security Classification Administrative Support task, Westech proposed a part-time SME to "assist in and respond to findings associated with program self-assessments and Security Surveys." Id. at 1623. However, the NNSA determined that 0.2 FTE was insufficient to resolve findings resulting from self-assessments or surveys, id. at 1871, because such findings "require an involved response." Id. at 1959. This makes clear that Westech failed to understand the depth of the work, and that its cost proposal was inconsistent with its technical proposal. Thus, pursuant to the Solicitation, it was within the NNSA's discretion to downgrade Westech's technical score if the NNSA believed that Westech's proposal did not reflect a clear understanding of the SOW requirements. Accordingly, the court finds that the NNSA's decision to increase Westech's proposed costs and lower Westech's technical score was rational.

---

Joint Venture v. United States, 78 Fed. Cl. 366, 371 n.5 (2007) (stating that while the court gives "serious consideration" to the GAO's decisions, a GAO decision with respect to a particular procurement is afforded no deference, except when an agency follows a GAO recommendation and the agency action is protested in this court).

### C. Plaintiff Failed to Prove That the NNSA Committed Prejudicial Error; Thus, This Court Will Not Permanently Enjoin PAI's Performance of the Contract Nor Will the Court Direct the NNSA to Reevaluate the Contract.

Westech asserts that the NNSA's probable cost adjustments and "double penalty" lacked a rational basis. Pl.'s Mot. 27; Pl.'s Reply & Resp. 27-28. Plaintiff states that it was the lowest offeror in the competitive range, even considering the NNSA's probable cost adjustments of approximately $2.8 million. Pl.'s Mot. 27, 32. Thus, plaintiff contends that "[c]orrection of any of the errors identified by Westech would change the factors to be considered in the cost/technical tradeoff and would result in a 'substantial chance that [Westech] would receive an award - that it was within the zone of active consideration.'" Pl.'s Reply & Resp. 27 (alteration in original) (citation omitted). Further, plaintiff asserts that if Westech is "given credit for having the 2.5 FTE[s] that NNSA has charged to its probable cost, then its technical score must . . . rise into the Excellent range," thus correcting the double penalty. Id. at 28.

Assuming, arguendo, that this court had found that the NNSA's decision-making lacked a rational basis, the court must still decide whether Westech was prejudiced by the NNSA's conduct. See Bannum, 404 F.3d at 1351. A claim on the merits of a bid protest will only succeed if both requirements are satisfied. Id.; Galen Med. Assocs., 369 F.3d at 1330.

#### 1. Standard for Prejudice

There has been great debate regarding the burden that a protestor must meet to prove prejudice. Data Gen. Corp., 78 F.3d at 1562 (recognizing that there have been variations in the formulation of what is necessary to show prejudice); Textron v. United States, 74 Fed. Cl. 277, 283-84, 327-30 (2006) (same); Comprehensive Health Servs., Inc. v. United States, 70 Fed. Cl. 700, 717-18 (2006) (same). In CACI-Inc. Federal v. United States, the Federal Circuit stated that "the disappointed bidder need demonstrate only that if its bid had been fairly and honestly considered, 'there was a substantial chance that [it] would receive an award–that it was within the zone of active consideration.'" 719 F.2d at 1574-75 (quoting Morgan Bus. Assocs. v. United States, 619 F.2d 892, 896 (Ct. Cl. 1980)).

However, in Data General, the Federal Circuit elaborated on the standard and the evidence required to satisfy the "substantial chance" test. 78 F.3d at 1562-63. The Court held that "a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Id. at 1562. "On the other hand, a showing of a mere possibility that the protester would have received the contract but for the error is inadequate to show prejudice . . . . The proper standard lies between these polarities." Id. The "appropriate standard" is for a "protester [to] show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." Id. Noting that its approach was a departure from the "substantial chance" test, the Federal Circuit explained:

> This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed., 719 F.2d at 1574. The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

Id. at 1563.

As the Court of Federal Claims noted in Textron:

> Since 1990 the substantial-chance requirement has been construed as requiring everything from a "greater than insubstantial" chance of success on the merits, Information Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003), to a "reasonable" likelihood of receiving the award but for the alleged error, Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562-63 (Fed. Cir. 1996), to allowing only protest by the second lowest bidder, United States v. Int'l Bus. Machines Corp., 892 F.2d 1006, 1011 (Fed. Cir. 1990).[39]

74 Fed. Cl. at 283-84 (footnote added).

More recently, the Federal Circuit in Bannum held that "[t]o establish prejudice, [a plaintiff is] required to show that there was a 'substantial chance' it would have received the contract award but for the . . . errors in the bid process." 404 F.3d at 1358; see also Moore's Cafeteria Servs. v. United States, 77 Fed. Cl. 180, 187 (2006) (applying the standard for prejudice set forth in Bannum); Info. Sci. Corp. v. United States, 73 Fed. Cl. 70, 116-18 (2006) (same). Certainly, "minor errors or irregularities, i.e., harmless errors, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision." Metcalf Constr., 53 Fed. Cl. at 622 (citation omitted). Accordingly, plaintiff has the burden of establishing that but for any errors in the procurement process, Westech had a substantial chance of being awarded the contract.

### 2. The Case Sub Judice

Plaintiff asserts that had the NNSA not increased plaintiff's proposed costs in one or more of the five areas described above, plaintiff would have secured the contract. Pl.'s Mot. 32. Assuming plaintiff was correct that the NNSA's decision to increase plaintiff's cost proposal lacked a rational basis, plaintiff would nevertheless fail to establish that it had a substantial chance of obtaining the award.

---

[39] The court in Textron, 74 Fed. Cl. 277, provides a thorough review of case law regarding the "substantial chance" standard.

For example, in challenging the NNSA's cost realism analysis, Westech emphasizes that its final proposed cost, and even its adjusted probable cost, was the lowest of the four offerors. See Pl.'s Mot. 15, 17; Pl.'s Reply & Resp. 5-6, 27. Plaintiff argues that if the NNSA had not raised Westech's proposed cost, the difference between Westech's proposed cost and PAI's probable cost would have been approximately [ ]. Pl.'s Reply & Resp. 26, 30; AR 1985 (reflecting that Westech's proposed cost was [ ] and PAI's probable cost was $22,093,871). Once the NNSA made adjustments to Westech's proposal, the gap between the two offerors narrowed Westech's probable cost to [ ] lower than PAI's probable cost. AR 1985. Indeed, in her decision, the SSA acknowledged that Westech offered both the lowest proposed cost and lowest probable cost. Id. at 1986. However, the SSA's evaluation of the proposals focused primarily on the Technical Evaluation Criteria, id. at 1989, since the Solicitation deemed these criteria as significantly more important than the Cost Evaluation Criteria. Id. (recognizing the "RFP's emphasis on the importance of the technical evaluation criteria . . . with regard to providing the type of security services necessary at the NTS"); see also id. (noting that "costs are significantly less important than the technical evaluation criteria"). Overall, the SSA found the technical proposals of Santa Fe, PSI, and PAI to be "essentially equivalent," id. at 1988, but found that Westech's proposal was a risk because of its inexperienced Program Manager and inadequate staffing. Id. at 1989. As such, the SSA found that despite Westech's lower cost, PAI was the best value to the government in light of its "strong overall technical proposal[]." Id. Because the SSA was concerned about more than just Westech's inadequate staffing, plaintiff fails to establish that it had a substantial chance of receiving the contract but for any of the alleged errors in the procurement process.

Plaintiff also argues that its technical score must rise to "Excellent" if Westech is "given credit for having the 2.5 FTE that NNSA has charged to its probable cost." Pl.'s Reply & Resp. 28. Plaintiff contends that its technical score was [ ], which qualified as "Good," and it was "[ ] short of the cut off for EXCELLENT." Pl.'s Mot. 31. However, a closer look at the components of the technical score is necessary to evaluate the validity of plaintiff's assertion. Specifically, the court examines the Key Personnel and Technical Capability factors because Westech was rated the lowest of the four offerors in these two areas. AR 1934; see also id. at 1985 (reflecting that Westech was rated at 85% (Excellent) for Key Personnel and at 78% (Good) for Technical Capability). For Key Personnel, the SSA noted that the other three offerors proposed a better Program Manager. Id. at 1987 (noting that Westech was rated lower than the other offerors because its "proposed Program Manager did not clearly demonstrate that he had the breadth of experience and technical expertise necessary for the position for which he is proposed"). Westech does not challenge this determination. This is a significant shortcoming given that the position of Program Manager was significantly more important than any of the other positions. Id. at 55. Because the position of Project Manager was viewed as a linchpin to the project, that position was weighed more heavily than any of the other Key Personnel. Id. However, despite being armed with the knowledge that the individual designated as the Program Manager could make or break a proposal, plaintiff's proposed candidate fell short in a number of respects.

For Technical Capability, Westech's score was [ ] ([ ] points out of 40 possible points). Id. at 1910, 1987. This score qualified Westech for a "Good" rating, meaning that "[t]he proposal demonstrate[d] a good understanding of contractual requirements and capability to perform the contractual work[, and] . . . [t]he proposal contain[ed] strengths that outweigh[ed] any weaknesses." Id. at 64. Additionally, within the Technical Capability category, Westech received a rating of "Significant Weakness" for its technical approach. Id. at 1943. The SSA was "concerned that Westech's shortfall in its proposed staffing, without adequate explanation, could adversely affect successful performance of [the four overlapping] SOW elements." Id. at 1987; see also id. at 1911 ("Westech was rated lower because in evaluating its Technical Approach, the SEB identified weaknesses in some SOW areas."). Additionally, the SSA was concerned that "Westech's approach to VAs could compromise the role of the Federal personnel in providing independent oversight of the contractor." Id. at 1987. The SSA concluded that Westech's overall technical approach raised the risk of unsuccessful contract performance. Id.

Even if the shortfall in staffing was cured by adjustments to the proposed costs, the SSA's main concern, in accordance with the Solicitation, was Westech's overall technical approach. Id. Westech's score for Technical Capability would have to increase by [ ] percent in order to achieve a rating of 85% to remain competitive with the other offerors who received an "Excellent" rating. Thus, even if Westech was awarded points for the additional 2.5 FTEs to cure understaffing, it is not reasonable that this correction alone would raise Westech's technical score by [ ] percent since understaffing was not the SSA's sole concern. Id. Provided that the cost proposal played a less significant role than the technical evaluation, plaintiff fails to establish that it had a substantial chance of being awarded the contract.

In sum, the court holds that the NNSA's evaluation of plaintiff's proposal was not arbitrary and capricious, was not an abuse of discretion, and was in accordance with the law.[40]

## V. PLAINTIFF'S REQUEST FOR BID PROPOSAL COSTS

Plaintiff seeks its bid preparation costs incurred in responding to the Solicitation. Pl.'s Mot. 33. A disappointed bidder may recover the costs of preparing its unsuccessful bid if it

---

[40] As noted in the Procedural History above, in its Cross-Motion, defendant moved to supplement the administrative record with a declaration from Ms. Bodin, a Security Team Lead for the Assistant Manager for S&S at the NSO. The declaration of Ms. Bodin seeks to "inform the Court of the consequences to the NTS, NSO and national security of granting Westech's requests for injunctive relief." Def.'s Cross-Mot. 30 n. 13. Plaintiff then filed its Opposition and its Motion to Strike. Because the court finds that plaintiff fails to establish that the NNSA's decision was arbitrary or capricious, it is unnecessary to address plaintiff's request for injunctive relief. Thus, while an administrative record may be supplemented in certain circumstances, i.e., where it will allow for "meaningful judicial review," Impresa, 238 F.3d at 1338, supplementation of the administrative record here is unnecessary. Accordingly, defendant's Motion to Supplement and plaintiff's Motion to Strike are denied as moot.

establishes that the agency's decision was arbitrary and capricious. Burroughs Corp., 617 F.2d at 597.

The United States Court of Claims ("Court of Claims"), the predecessor court to both the Court of Federal Claims and the Federal Circuit, set forth the standard for recovery of bid preparation costs in Keco Industries, 492 F.2d at 1203. The four criteria are: (1) "subjective bad faith on the part of procuring officials, depriving a bidder of the fair and honest consideration of his proposal"; (2) "proof that there was no reasonable basis for the administrative decision"; (3) "the amount of discretion entrusted to the procurement officials by applicable statutes and regulations"; and (4) "proven violation of pertinent statutes or regulations." Id. at 1203-04 (internal quotations omitted). The Court of Claims further noted that the application of the criteria depends on "the type of error or dereliction committed by the Government" and "whether the error or dereliction occurred with respect to the claimant's own bid or that of a competitor." Id. at 1204.

As the court determined above, the NNSA's evaluation of Westech's proposal was rational. Additionally, plaintiff has not established "subjective bad faith" on the part of the NNSA; has not met its burden to overcome the breadth of discretion to which the NNSA's procurement officials are entitled in securing negotiated contracts; and has not established that the NNSA violated any relevant statutes or regulations. The court finds that Westech failed to prove that the NNSA committed error in evaluating its proposal. Thus, Westech is not entitled to its bid preparation costs.

## VI. CONCLUSION

For the foregoing reasons, it is ORDERED that:

1. Plaintiff's Motion for Judgment on the Administrative Record is **DENIED.**[41]

2. Defendant's Cross-Motion for Judgment on the Administrative Record is **GRANTED.**

3. Defendant's Motion to Supplement the Administrative Record with the Declaration of Patricia Bodin is **DENIED as moot**. Plaintiff's Motion to Strike Section V of Defendant's Cross-Motion is **DENIED as moot**.

4. The court has issued this opinion under seal in accordance with the court's Protective Order. The parties are directed to file a proposed redacted copy of this

[41] Because the court determines that the government is entitled to judgment on the administrative record, the court need not address plaintiff's argument regarding entitlement to injunctive relief; thus, plaintiff's request for injunctive relief is denied.

opinion, with any material deemed proprietary enclosed in brackets, **no later than Monday, November 5, 2007.**

5. Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge